## STATE OF CONNECTICUT *v.* RODERICK N. CARDWELL
### (SC 15861)

Callahan, C. J., and Berdon, Norcott, Katz and McDonald, Js.

Argued March 19—officially released September 8, 1998

*Nicholas P. Cardwell,* for the appellant (defendant).

*Roger F. Reynolds,* assistant attorney general, with whom were *Steven M. Rutstein,* assistant attorney general, and, on the brief, *Richard Blumenthal,* attorney general, for the appellee (state).

*Opinion*

BERDON, J. This appeal arises out of a complaint filed by the plaintiff, the state of Connecticut, against the defendant, Roderick N. Cardwell, and raises the principal issue of whether the defendant is engaged in "ticket scalping" as proscribed by General Statutes § 53-289[1] and, as a result, is in violation of General Statutes § 42-110b (a),[2] a provision of the Connecticut Unfair Trade Practices Act (CUTPA). General Statutes § 42-110a et seq. Specifically, the complaint alleges that the defendant, as the sole proprietor of a business known

_____

[1] General Statutes § 53-289 provides: "Ticket scalping. No person shall sell, offer for sale or attempt to sell any ticket, privilege or license of admission to an entertainment event, including, but not limited to, any place of amusement, arena, stadium, theater, performance, sport, exhibition or athletic contest given in this state, at a price greater than the price, including tax, printed thereon, or at a price greater than the price fixed for admission, including tax, and a reasonable service charge for services actually rendered not to exceed three dollars. The owner or operator of the property on which such entertainment event is to be held or is being held may authorize, in writing, any person to sell such ticket, privilege or license of admission at a price in excess of that authorized under this section. Such writing shall specify the price for which such ticket, privilege or license of admission is to be sold. Any person violating any provision of this section shall be guilty of ticket scalping. Ticket scalping is a class C misdemeanor for a first offense, a class A misdemeanor for a second offense and a class D felony for any subsequent offense. The sale of each ticket, privilege or license of admission in violation of any provision of this section shall constitute a separate offense."

[2] General Statutes § 42-110b provides in relevant part: "Unfair trade practices prohibited. Legislative intent. (a) No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. . . .

"(d) It is the intention of the legislature that this chapter be remedial and be so construed."

as "Ticketworld," sells, offers for sale, or attempts to sell tickets to sporting and entertainment events to be held in Connecticut, to purchasers located in Connecticut, for a price more than $3 in excess of the price, including tax, printed on the face of the ticket or fixed for admission, in violation of § 53-289, and that this violation constitutes an unfair or deceptive trade practice in violation of § 42-110b (a). Further, the complaint alleges that the defendant engages in various other practices that also constitute unfair or deceptive trade practices in violation of CUTPA. Finally, the complaint alleges that the defendant violated General Statutes § 35-1[3] by operating an office of Ticketworld in Connecticut for several years without having filed a trade name certificate with the town clerk, and that such violation constituted a per se violation of CUTPA.

The trial court first determined that the defendant, in the regular course of business, engages in conduct that violates § 53-289 and, therefore, also violates CUTPA. Accordingly, it issued a permanent injunction enjoining the defendant from engaging in activities within Connecticut in connection with the sale, offering for sale, attempting to sell, or delivery of tickets to any entertainment event to be held in the state for a price in excess of $3 of the fixed price for admission. In addition, the trial court determined that certain other

---

[3] General Statutes § 35-1 provides in relevant part: "Fictitious trade names prohibited. Exceptions. Penalty. Unfair trade practice. No person, except as hereinafter provided, shall conduct or transact business in this state, under any assumed name, or under any designation, name or style, corporate or otherwise, other than the real name or names of the person or persons conducting or transacting such business, unless there has been filed, in the office of the town clerk in the town in which such business is or is to be conducted or transacted, a certificate stating the name under which such business is or is to be conducted or transacted and the full name and post-office address of each person conducting or transacting such business . . . . Failure to comply with the provisions of this section shall be deemed to be an unfair or deceptive trade practice under subsection (a) of section 42-110b."

past practices by the defendant had violated CUTPA and it assessed penalties and fines for those violations. Lastly, the court concluded that the defendant had violated § 35-1 and, therefore, CUTPA, by operating a business in the state for which he had not filed a trade name certificate, and it imposed a penalty for that violation.

The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023, now Practice Book (1998 Rev.) § 65-1, and General Statutes § 51-199 (c). The dispositive issues on appeal are whether: (1) the defendant's conduct violates § 53-289; (2) the trial court abused its discretion in awarding restitution and imposing civil penalties as a result of its finding that the defendant had engaged in deceptive trade practices in violation of CUTPA; and (3) the trial court abused its discretion by imposing a penalty on the defendant for his failure to file a trade name certificate as required by § 35-1.[4] We affirm the judgment of the trial court in part and reverse the judgment in part.

The trial court found the following facts. The defendant is a resident of the state of Connecticut who operates Ticketworld as a sole proprietor.[5] The defendant is engaged in the business of selling tickets to entertainment and sporting events to be held at various locations throughout the nation, including events to be held in Connecticut. Ticketworld operates from two locations, one in Hartford and one in Springfield, Massachusetts. In order to obtain business, Ticketworld advertises in newspapers, including newspapers that circulate in

[4] The defendant also argues on appeal that § 53-289 is unconstitutional. Because we decide that the defendant's conduct did not violate § 53-289, we do not address the constitutional argument.

[5] Hereinafter, we refer to the defendant, in his capacity as the sole proprietor of Ticketworld, and Ticketworld, interchangeably.

Connecticut. The advertisements that appear in Connecticut newspapers instruct prospective purchasers to telephone the Hartford office of Ticketworld for tickets to events that will take place outside of Connecticut, and to telephone the Springfield office for tickets to events that will be held in Connecticut. In the event that a prospective customer telephones the Hartford office for tickets to a Connecticut event, the prospective customer is instructed to telephone the Springfield office in order to purchase those tickets.

On many occasions, Ticketworld has sold tickets to Connecticut events from its Springfield office for which it has charged a price that exceeded the fixed price of the ticket, tax included, by more than $3. The court found, specifically, that Ticketworld: (1) had charged Mary Lou Lupovitch $125 per ticket for tickets to an event at the Connecticut Tennis Center in New Haven, although those tickets had a fixed price of $32.50 per ticket; (2) had charged Susan Van Ormer $60 per ticket for tickets to an event in Hartford, although those tickets had a fixed price of $28 per ticket; (3) had charged Cyrilla Bergeron $137 per ticket for tickets to an event in Hartford, although those tickets had a fixed price of $53.50 per ticket; and (4) had charged Linda Martin $65 per ticket for tickets to an event in Hartford, although those tickets had a fixed price of $26.50 per ticket.[6] The court determined that the defendant, in selling these tickets for a price in excess of the fixed price for admission, had violated § 53-289. Consequently, it issued a permanent injunction prohibiting the defendant from engaging in any activity within the state in connection with selling, offering for sale, attempting to sell, mailing

---

[6] Although the trial court's memorandum of decision is silent with respect to the places of residence of these parties, our review of the transcripts reveals that they all were Connecticut residents who purchased tickets from Ticketworld after telephoning Ticketworld's Springfield office and placing their ticket orders with that office over the telephone.

or otherwise delivering, or advertising or promoting the sale of any ticket to an event to be held in Connecticut for a price more than $3 in excess of the fixed price of the ticket, including tax.

The court further found that Ticketworld, on a few occasions, had misrepresented information regarding tickets sold to Connecticut customers from its Springfield office. Specifically, the court found that Lynn Boivin was told by an employee of the defendant that the tickets she was purchasing for an event to be held in Massachusetts were for prime seats in an area known as the "golden circle" and that she was charged a premium for such seats. In fact, the tickets were for "marginal seats" that were distant from the stage and available to the general public. The court found that the representations regarding the location of the seats amounted to a deceptive trade practice and constituted a CUTPA violation. Because Boivin paid more than the $35 that the court determined the tickets reasonably to be worth, the court ordered restitution in the amount of $180, and assessed a civil penalty in the amount of $1500 pursuant to General Statutes § 42-110o (b).

The court also found that Ticketworld's actions with respect to Lupovitch constituted a deceptive trade practice in violation of CUTPA. Lupovitch was informed by Ticketworld that the tickets she had purchased were for seats directly in front of the stage. In actuality, the seats were in a far inferior location. The defendant offered that his employees did not have a seating chart at the time that they described the location of the seats to Lupovitch. The court concluded that no representations should have been made if there was no basis of knowledge to support such representations. The court ordered restitution in the amount of $185 and assessed a civil penalty in the amount of $1500.

In addition, the court found that Ticketworld had engaged in a deceptive trade practice when it sold tickets to the Kentucky Derby to Harold Keller and thereby violated CUTPA. The defendant informed Keller that it could obtain seats at the "1/8th pole" that would provide a clear view of the finish line, and that it could furnish the tickets by April 27 for the May 7 event. The tickets were not delivered until May 5, and they were not near the "1/8th pole" but were in a remote location from which the finish line could not be seen. Although the trial court found that, to the defendant's credit, the defendant eventually had to pay an additional $1200 to obtain the tickets for Keller, for which Keller was not charged, the court also found that the defendant's conduct in selling tickets, without knowing whether it could deliver such tickets and without informing Keller that the availability of the tickets was uncertain, constituted a deceptive trade practice. The court ordered restitution in the amount of $1400 and assessed a penalty of $2000.

Finally, the court determined that the defendant had failed to file a trade name certificate in connection with its Hartford office, in violation of § 35-1, which constitutes a per se violation of CUTPA. As a result, the court, pursuant to § 42-110o (b), assessed a penalty of $1000.

I

The defendant first claims that the trial court improperly determined that his conduct in operating Ticketworld violates § 53-289. Specifically, the defendant contends that Ticketworld neither sells, offers for sale nor attempts to sell tickets in Connecticut for a price in excess of the statutory maximum established by § 53-289. Further, the defendant contends, because § 53-289 is a criminal statute that is not applicable to conduct

that occurs outside of Connecticut, Ticketworld's out-of-state activities are not proscribed by § 53-289. We agree.[7]

Resolution of the issue of whether the defendant's conduct violates § 53-289 requires us first to review the trial court's conclusions as to the nature and situs of the defendant's activities insofar as those activities may involve the sale, offering for sale or attempt to sell tickets for a price in excess of $3 over the fixed price of the tickets. Next, if we determine that the defendant sells, offers for sale or attempts to sell tickets to Connecticut residents for a price above the statutory maximum outside of Connecticut, we must determine whether § 53-289 was intended to apply to activities that take place out-of-state.

A

We first address the defendant's claim that it neither sells, attempts to sell nor offers for sale, within Connecticut, tickets to Connecticut events for a price in excess of $3 over the fixed price of the ticket. Although the parties agree that the defendant sells tickets to events to be held in Connecticut only through its Springfield office, the parties disagree as to where the sales through

---

[7] In pursuing a claim before the trial court that the state is estopped from now claiming that the defendant's ticket sales through its Springfield office violate § 53-289, the defendant points out that the precise conduct that is the basis for the state's claim of ticket scalping—sales of tickets from its Springfield office—was the subject of litigation between the state and the defendant in 1987. That litigation resulted in a final settlement agreement between the state and the defendant, which in relevant part provided that: (1) the defendant would not admit any wrongdoing; (2) the defendant would voluntarily comply with § 53-289 by not selling tickets in Connecticut to Connecticut events at a price in excess of the statutory maximum; and (3) the resolution of the action by agreement would have no binding effect on either party other than with respect to the defendant's promise of voluntary compliance and would not adjudicate any of the issues raised in the proceedings. Although the defendant does not pursue an estoppel claim on appeal, the state never contended that the defendant has ever violated the aforesaid agreement.

that office occur, where the offers to sell occur, and whether the defendant's overall activities in connection with both of its offices amount to attempts to sell tickets within Connecticut. In reviewing those issues, we note that the underlying facts are undisputed, and the defendant challenges only the trial court's legal conclusions as to the application of the law to those facts. Our review of a lower court's application of the law to the facts qualifies for full, independent review. *State* v. *James*, 237 Conn. 390, 406, 678 A.2d 1338 (1996).

1

In Connecticut, the sale of goods is governed by the Connecticut Uniform Commercial Code-Sales (code).[8] General Statutes § 42a-2-101 et seq. Under the code, a "sale" is defined as "the passing of title from the seller to the buyer for a price . . . ." General Statutes § 42a-2-106 (1). The code further provides that "[u]nless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place . . . ." General Statutes § 42a-2-401 (2). In addition, the code provides that "if the contract requires or authorizes the seller to send the goods to the buyer but does not require him to deliver them at destination, title passes to the buyer at the time and place of shipment . . . ." General Statutes § 42a-2-401 (2) (a).

The latter provision reflects the distinction made by the code between "shipment" and "destination" con-

---

[8] The provisions of the code apply to transactions in goods where goods are defined in part as "all things . . . which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities covered by article 8 and things in action. . . ." General Statutes § 42a-2-105 (1). The code applies, therefore, to the sale of tickets to entertainment events.

tracts. Under the code, when a carrier is used to transport the goods sold, shipment contracts and destination contracts are the only two types of sales contracts recognized. General Statutes § 42a-2-401 (2); 67 Am. Jur. 2d, Sales § 540 (1985). Furthermore, under the code, "[t]he 'shipment' contract is regarded as the normal one, and the 'destination' contract is regarded as the variant." 67 Am. Jur. 2d, supra, § 540; see also *Ninth Street East, Ltd.* v. *Harrison*, 5 Conn. Cir. Ct. 597, 601, 259 A.2d 772 (1968). Under a shipment contract, the seller is either required or authorized to ship the goods to the buyer, but is not required to deliver them at a particular destination, and delivery to the carrier constitutes delivery to the buyer. General Statutes § 42a-2-401 (2) (a); 67 Am. Jur. 2d, supra, § 541. Indeed, this was the governing law even prior to the enactment of the code. See *Home Pattern Co.* v. *Mertz Co.*, 88 Conn. 22, 25, 90 A. 33 (1914) (under common law, title passed to buyer when goods were delivered to carrier where contract terms specified that delivery was to be "f.o.b." to designated railroad carrier). Under a destination contract, the seller is required to deliver the goods to the buyer at the named destination and delivery occurs upon tender of the goods at that destination. General Statutes § 42a-2-401 (2) (b); 67 Am. Jur. 2d, supra, § 543. A strong presumption against the creation of destination contracts is contained in the code such that, in the absence of specific proof of agreement by the seller to deliver the goods to a particular destination and to bear the attendant risk of loss until such delivery, a sales contract that merely provides that the goods will be shipped to a certain location will be deemed to be a shipment contract. *Ninth Street East, Ltd.* v. *Harrison*, supra, 601; see also 67 Am. Jur. 2d, supra, § 543.

In this case, the contracts made by the defendant for the sale of tickets do not contain any explicit agreement by the defendant to deliver the goods to a particular

destination or to bear the attendant risk of loss until such time as the goods are delivered. Therefore, the contracts at issue in this case are properly classified as shipment contracts. Because delivery of the goods to the carrier constitutes delivery to the buyer under a shipment contract; General Statutes § 42a-2-401 (2) (a); with respect to each sale of tickets made by the defendant, delivery is made to the post office or other commercial carrier, and hence to the buyer, within Massachusetts. As a result, the "sale" of the tickets, as defined by the code, occurs in Massachusetts.[9] Consequently, the trial court's determination that the defendant sells tickets within Connecticut, and thereby violates § 53-289, was incorrect.

2

The trial court also determined that the defendant violates § 53-289 by offering by telephone to sell tickets to Connecticut events to customers located in Connecticut for a price more than $3 in excess of the fixed price of the ticket. The basis for the trial court's ruling was its conclusion that an offer is made when it reaches the ear of the customer. The trial court memorandum of decision cites no authority for that proposition, however, and we have discovered none.

Although we have not discovered any authority for the trial court's conclusion, we also have not discovered any significant support for the opposite conclusion. Both the case law and scholarly literature focus almost exclusively on the place of formation of contracts and, to a certain extent, also consider the place where acceptance or other last requisite formality of the contract occurs as a means of determining where the contract was formed. See, e.g., 2 S. Williston, Contracts (4th Ed.

---

[9] Our analysis is limited to the sale of tickets, not themselves contraband.

Lord 1991) §§ 6:34 and 6:61. These discussions, however, are less than illuminating with respect to where an offer occurs.[10]

---

[10] A few cases touch upon the issue of where an offer is made in the context of investment securities regulation. For example, in *Kreis* v. *Mates Investment Fund, Inc.*, 473 F.2d 1308, 1311 (8th Cir. 1973), an action for rescission of a contract of sale based upon noncompliance with state securities law, the statute alleged to have been violated provided a definition of an "offer to sell." Under the statute, an offer to sell was deemed to have been made in the state of Missouri, regardless of whether any party was present in the state, if the offer originated from the state or if the offer was directed by the offeror to the state and received in the state. Id. In determining where the offer was made, therefore, the court was guided by a comprehensive definition of offer provided in the statute and did not have reason to consider common-law principles regarding the place where offers are made.

In *Europe & Overseas Commodity Traders, S.A.* v. *Banque Paribas London*, 147 F.3d 118, 120 (2d Cir. 1998), the issue was whether an offer to sell foreign securities made via telephone and facsimile from England to a Canadian investor vacationing in Florida, which resulted in orders to purchase being placed from Florida, provided enough of a connection to implicate federal securities laws. In negotiating the transaction, the court determined that both parties had been responsible for initiating calls to the other. Id., 121. Applying a "conduct and effects" test that the Second Circuit uses to determine the extraterritorial scope of the fraud provisions of the federal securities laws, the court concluded that federal laws were not implicated. Id., 123. One of the factors that the court considered was the locus of the offer. Id., 125–26. In summing up its conclusions, the court implied that it determined the offer to have been made in Florida, when it stated that "the alleged solicitation, offer to sell, and purchases occurring while [the plaintiff] was present in Florida did not bring this otherwise entirely foreign transaction within the antifraud provisions of [federal] securities law." Id., 131.

In *Robinson* v. *Cupples Container Co.*, 513 F.2d 1274, 1280 (9th Cir. 1975), the court concluded that the failure to comply with California securities registration laws would not void a stock exchange involving a California investor that was validly negotiated in another state and was not initiated by the seller. The court noted, however, that securities transactions had been determined to be illegal when the seller had initiated contact in California in an effort to sell unregistered securities there. Id.

Very generally speaking, these cases may be interpreted as indicative that, in considering whether a state's laws have been violated by a contract involving a nonresident seller, courts have considered: (1) whether the offer to sell was made from within the state; and (2) whether the offer to sell was directed at the state through communications initiated by the out-of-state seller. In the present case, all of the telephone calls were initiated by the offerees.

The defendant argues that the only sensible conclusion as to where an offer is made is one that deems an offer to have been made in the place where the person communicating the offer is located. Any other result, the defendant contends, would unfairly subject business people selling products to customers who call the seller by telephone to the laws of the countless other jurisdictions from which those customers place their calls. In particular, if other jurisdictions have enacted criminal statutes making it a crime to offer for sale certain products in those states, the out-of-state seller conducting business from its home state would then be guilty of violating criminal statutes in other states if a caller ordering its products via telephone happened to be calling from a state where the type of sale at issue was illegal. To make matters worse, the defendant argues, a seller will not necessarily even know the location from which a particular customer is calling and, therefore, will not know when it is subjecting itself to the laws of other, unknown jurisdictions by offering its products for sale from its office in its home state. Furthermore, the defendant contends, even if sellers were required to inquire as to the location from which their prospective customers are calling, there could be customers who would misrepresent the location from which they were calling. Therefore, according to the defendant, a rule that designates the place of the offer as the place where the offer reaches the ear of the offeree would unfairly subject sellers to the laws of numerous and possibly unknown jurisdictions, an irrational and unfair result. Conversely, the state has failed to cite any support for such a rule or offered any significant reason why the adoption of such a rule would be advantageous.

In the absence of any significant authority on the issue of where an offer is deemed to occur, we find the defendant's practical, common sense arguments to be

persuasive. Consequently, we conclude that the defendant in this case offers to sell tickets from its office in Springfield, where it is located when it conveys the offers into the telephone. In addition, because the defendant's offers to sell tickets are not made in Connecticut, we further conclude that the defendant does not violate § 53-289 by offering to sell tickets out of its Springfield office to events to be held in Connecticut to Connecticut residents.[11]

3

Next, the trial court concluded that the defendant violates § 53-289 by attempting to sell tickets, within Connecticut, to Connecticut events for a price more than $3 in excess of the fixed price of the ticket. The basis for the trial court's determination was its interpretation of the phrase "attempt to sell" as used in § 53-289. The trial court analogized the phrase "attempt to sell" to the phrase "expose for sale" used in a statute prohibiting dealing in fireworks; General Statutes § 29-357; and reasoned that "attempt to sell" is a phrase that, like "expose for sale," is sufficiently broad and comprehensive to encompass activities such as advertising in Connecticut and referring callers from the Hartford office to the Springfield office.

On appeal, the defendant objects to the definition of "attempt" applied by the trial court. The defendant argues that, within the context of the criminal law, "attempt" has a statutorily defined meaning, and that meaning should have been applied in this case. If the latter definition had been employed, the defendant argues, he could not have been found guilty of

---

[11] The fact that the defendant advertises tickets available through his Springfield office in Connecticut newspapers also does not amount to his offering tickets for sale in violation of § 53-289. It is elementary black letter law that an advertisement is not an offer, but is merely an invitation to bid or to enter into a bargain. *Lane* v. *Hopfeld*, 160 Conn. 53, 57, 273 A.2d 721 (1970); 1 S. Williston, Contracts (4th Ed. Lord 1990) § 4:7, pp. 286–87.

attempting to sell tickets in violation of § 53-289. We agree.

General Statutes § 53a-49 defines criminal attempt. That section provides in relevant part: "(a) A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he: (1) Intentionally engages in conduct which would constitute the crime if attendant circumstances were as he believes them to be; or (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime. . . ." Because § 53-289, which the defendant was found to have violated, is a criminal statute, it is appropriate to apply the definition of criminal attempt contained in § 53a-49 in determining whether the defendant violated § 53-289.

The conduct that the trial court determined amounts to an attempt to sell is the advertising of tickets in Connecticut newspapers and the practice engaged in by employees of the defendant's Hartford office of referring callers to the Springfield office for tickets to Connecticut events. Applying the definition of § 53a-49 to these activities, it is clear that neither constitutes an attempt to sell in a criminal sense. First, advertising, although engaged in intentionally, is not conduct that "would constitute [a] crime if attendant circumstances were as [the defendant] believe[d] them to be . . . ." General Statutes § 53a-49 (a) (1). By advertising, the defendant is not engaging in an effort to sell tickets illegally—on the contrary, he is advertising tickets that are available through his Massachusetts office at a price that is legal in Massachusetts, and tickets available through his Connecticut office at a price that is legal in Connecticut. Second, advertising, although engaged in intentionally, does not constitute an act amounting

to a "substantial step in a course of conduct" intended to culminate in the commission of a crime. Again, the purpose of the advertising is to promote legal ticket sales through the defendant's Springfield office. Third, referrals to the Springfield office do not constitute an attempt to sell in violation of § 53-289. The referrals direct customers to call the Springfield office in order to purchase tickets to Connecticut events precisely because the defendant knows that it cannot legally sell those tickets from its Hartford office at the price it would customarily charge in Springfield. The act of referring in and of itself does not constitute an act that would be criminal but for the defendant's mistaken belief about the surrounding circumstances, and does not constitute an act that amounts to a substantial step in a course of conduct intended to culminate in the commission of a crime. Rather, the defendant's intent in referring customers to his Springfield office is to accomplish legally in Massachusetts what it cannot do in Connecticut. There is no plan or intent on the defendant's part to engage in any sort of criminal activity.

In light of the definition of attempt provided by the Penal Code, there is no reason to interpret attempt, as that term is used in § 53-289—a criminal statute—any differently.[12] Therefore, we conclude that the defendant does not violate § 53-289 by attempting to sell tickets in Connecticut for a price in excess of the statutory maximum.

## B

Having determined that the defendant, in the course of its business, does not sell, offer for sale or attempt

---

[12] The legislative history of § 53-289 also supports our conclusion that advertising is not prohibited by § 53-289. The original version of the proposed bill contained a section prohibiting certain forms of advertising that was later omitted from the bill. Conn. Joint Standing Committee Hearings, Judiciary, Pt. 4, 1983 Sess., p. 1500. In connection with the omitted section, Representative Richard Tulisano had raised concerns that prohibiting adver-

to sell tickets to Connecticut events within Connecticut for a price in excess of the statutory maximum, we next address the defendant's claim that § 53-289 proscribes only conduct that occurs within the state. In advancing this argument, the defendant relies on the fact that, in enacting § 53-289, the legislature did not manifest an intent in the language of that section to prohibit conduct outside the state. The state contends, conversely, that the legislature has indicated that it intended that § 53-289 have an extraterritorial effect. Specifically, the state argues that the broad public policy underlying the statute and the fact that the conduct at issue results in harm to the citizens of Connecticut are indicative that the legislature intended that § 53-289 apply extraterritorially. We agree with the defendant.

Whether § 53-289 applies to conduct that occurs out-of-state is a matter of statutory interpretation. Statutory interpretation constitutes a matter of law; *Jenkins* v. *Jenkins*, 243 Conn. 584, 588, 704 A.2d 231 (1998); over which this court's review is plenary. *Crandall* v. *Gould*, 244 Conn. 583, 590, 711 A.2d 682 (1998). "[T]he process of statutory interpretation involves a reasoned search for the intention of the legislature. . . . *State* v. *Ledbetter*, 240 Conn. 317, 327, 692 A.2d 713 (1997). In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. . . . Furthermore, we presume that laws are enacted in view of existing relevant statutes . . . and that [s]tatutes are to be interpreted with regard to other relevant statutes because the legislature is presumed to have created a

tising would implicate first amendment free speech issues. Id., pp. 1485 and 1491. The bill was later passed into law without any restrictions on advertising.

consistent body of law. . . . *Conway* v. *Wilton*, 238 Conn. 653, 663–64, 680 A.2d 242 (1996)." (Internal quotation marks omitted.) *State Board of Labor Relations* v. *Freedom of Information Commission*, 244 Conn. 487, 495, 709 A.2d 1129 (1998). In addition, when the statute being construed is a criminal statute, it must be construed strictly against the state and in favor of the accused. *State* v. *Russell*, 218 Conn. 273, 278, 588 A.2d 1376 (1991).

In Connecticut, the principle of limited territorial jurisdiction further governs the application of criminal statutes. That principle limits the state's interest in vindicating its criminal statutes to within the boundaries of its territory. *State* v. *Ross*, 230 Conn. 183, 195, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1133, 130 L. Ed. 2d 1095 (1995). Although this court previously has indicated that the legislature has the authority to enact criminal statutes that have an extraterritorial effect; id., 199; a criminal statute that does not indicate that it is to have such an effect will be operative only within the boundaries of this state. Id., 200. "The ultimate question [in determining whether a statute has an extraterritorial effect] is . . . a matter of statutory construction." Id. The function of this court is to "decide whether, in enacting [the statute], the legislature manifested its intention to give extraterritorial effect to the [statute] . . . ." Id.

We begin our analysis with the language of the statute. Section 53-289 provides in relevant part that "[n]o person shall *sell, offer for sale or attempt to sell* any ticket, privilege or license of admission to an entertainment event . . . given in this state, at a price greater than the price, including tax, printed thereon, or at a price greater than the price fixed for admission, including tax, and a reasonable service charge for services actually rendered not to exceed three dollars. . . ." (Emphasis added.) The only reference to geography

contained in the statute is the reference to events to be held in Connecticut. Significantly, the statute does not contain any express indication that the legislature intended it to have an extraterritorial effect. Compare *People* v. *Concert Connection, Ltd.*, 211 App. Div. 2d 310, 315, 629 N.Y.S.2d 254 (1995) (New York's long arm statute explicitly provides that New York courts may "exercise personal jurisdiction over a nondomiciliary who 'contracts *anywhere* to supply goods or services in [New York]' " [emphasis added]).

In addition, the legislative history of § 53-289 does not indicate any intent by the legislature that the section should have an extraterritorial effect. Rather, the legislative history indicates that the statute was not intended to apply to out-of-state conduct. During the judiciary committee hearing on the bill, repeated references were made to ticket scalping as a regional problem. See Conn. Joint Standing Committee Hearings, Judiciary, Pt. 4, 1983 Sess., pp. 1442, 1484, 1491, 1496, 1503 and 1504. In order to address the problem of out-of-state ticket sales at a price above the statutory maximum, then Attorney General Joseph Lieberman recommended: (1) that the statute be amended to explicitly prohibit advertising in Connecticut by "scalpers"; id., p. 1496; and (2) that the state become part of an "inter-state compact to promote uniformity and enforcement regionally" of § 53-289's anti-ticket scalping provisions. Id. The need for further legislation in the form of a regional compact for the purpose of regulating out-of-state conduct was mentioned several times during both the Senate and judiciary proceedings. See, e.g., 26 S. Proc., Pt. 8, 1983 Sess., p. 2751, remarks of Senator Howard T. Owens; id., p. 2757, remarks of Senator William A. DiBella; Conn. Joint Standing Committee Hearings, supra, p. 1484, remarks of Representative Richard Tulisano; id., p. 1491, remarks of Clarine Nardi-Riddle. Apparently, the legislature recognized that an interpretation of the

proposal that would have it apply to out-of-state conduct had the potential to render it unconstitutional. See Conn. Joint Standing Committee Hearings, supra, pp. 1485, 1491, remarks of Representative Tulisano and Clarine Nardi-Riddle (raising concerns about interstate commerce and efforts to draft legislation narrowly and constitutionally). In addition, the advertising proposal was never acted upon by the legislature. Although the reason for not addressing advertising in the 1983 amendment is not apparent from its legislative history, a few isolated references to potential first amendment concerns were made. Id.

Because the general rule is that we punish only offenses committed within the territory of the state; *State* v. *Volpe*, 113 Conn. 288, 294, 155 A.2d 223 (1931); see also *State* v. *Ross*, supra, 230 Conn. 195; we will not apply a criminal statute extraterritorially without a significant indication that the legislature intended it to have that effect. In this case, there simply is no such indication. Rather, the language of § 53-289 is devoid of any manifestation of such an intent, and the legislative history provides a strong indication that the legislature did *not* intend that section to have an extraterritorial effect. Consequently, we conclude that § 53-289 was not intended to apply extraterritorially. Accordingly, we conclude that the trial court incorrectly decided that the defendant's conduct violated § 53-289 and CUTPA and, therefore, issued the permanent injunction improperly.

## II

The defendant also appeals the trial court's assessment of restitution and civil penalties with respect to specific instances of conduct involving individual customers. Specifically, the defendant claims that the trial court abused its discretion in finding that the defendant's conduct in each of those instances constituted a CUTPA violation. We disagree.

General Statutes § 42-110m (a) provides in relevant part that "[w]henever the commissioner has reason to believe that any person has been engaged or is engaged in an alleged violation of [CUTPA] said commissioner may . . . request the Attorney General to apply . . . for an order directing restitution . . . . The court may award the relief applied for or so much as it may deem proper . . . ." In addition, General Statutes § 42-110o (b) provides in relevant part that "[i]n any action brought under section 42-110m . . . the Attorney General . . . may recover . . . a civil penalty of not more than five thousand dollars for each [wilful] violation. For purposes of this subsection, a wilful violation occurs when the party committing the violation knew or should have known that his conduct was a violation of section 42-110b."

These sections vest the trial court with discretion to award relief and impose penalties as it deems appropriate under the circumstances of each case. "[A] defendant who seeks to reverse the exercise of judicial discretion assumes a heavy burden." (Internal quotation marks omitted.) *State* v. *Pieger*, 240 Conn. 639, 648, 692 A.2d 1273 (1997). In reviewing the trial court's exercise of its discretion under these sections, we must make every reasonable presumption in favor of the correctness of its action, and we will not disturb its action unless it acted unreasonably or misapplied the law. *Gelinas* v. *West Hartford*, 225 Conn. 575, 592, 626 A.2d 259 (1993); *State* v. *Payne*, 40 Conn. App. 1, 18, 669 A.2d 582 (1995), aff'd, 240 Conn. 766, 695 A.2d 525 (1997).

In this case, the trial court awarded restitution and imposed a civil penalty with respect to the defendant's sale of tickets to Boivin. The trial court determined that the defendant's employee had informed Boivin that the tickets that she was purchasing to a concert event were for premium seats in the "golden circle," but the seats turned out to be far distant from the stage and Boivin

could barely see the stage and performers. Because the trial court found that Boivin had been promised premium seats, and the seats provided to her were only marginal seats that were available to the general public, it awarded her restitution in an amount equal to the difference between the true value of the seats and the premium price that she paid. The court further imposed a $1500 penalty on the defendant.

On the basis of the evidence before it, the trial court properly could have determined that the defendant's conduct with respect to Boivin constituted a deceptive trade practice in violation of CUTPA. It was, therefore, within the trial court's discretion to order restitution pursuant to § 42-110m (a). Further, the record would support a finding that the defendant's conduct with regard to Boivin was wilful, in that it specifically represented that the tickets were for premium seats when in fact it knew or should have known that they were not prior to making the representation. Consequently, it was also within the trial court's discretion to impose a civil penalty for the wilful violation pursuant to § 42-110o (b).

The same analysis is appropriate for the restitution and civil penalties ordered by the court with respect to the defendant's conduct toward Lupovitch and Keller. In each case, the court determined that the defendant had misrepresented important facts about the tickets that it sold to those customers. The court found that the defendant's promises, under the circumstances of each transaction, amounted to a deceptive trade practice. There is ample evidence in the record to support the trial court's conclusion in each instance, and to support a finding that the defendant's conduct was wilful.[13] Therefore, it was entirely within the court's discretion in each instance to order restitution pursuant to

[13] The defendant argues that his conduct was not deceptive because he would have provided a full refund to each customer had they chosen not

§ 42-110m (a) and to impose civil penalties pursuant to § 42-110o (b).

## III

The defendant's final claim is that the trial court abused its discretion by imposing a penalty on the defendant for his failure to file a trade name certificate as required by § 35-1. The defendant does not dispute that between 1989 and 1995 he operated the Hartford office of Ticketworld without having filed a trade name certificate and, therefore, violated § 35-1, and, because § 35-1 provides that any violation of that section is also an unfair or deceptive trade practice in violation of CUTPA, violated CUTPA as well. Rather, he challenges the trial court's assessment of a $1000 penalty on the basis of the violation. We do not find an abuse of the trial court's discretion.

The basis upon which the defendant objects to the trial court's assessment of a penalty is that: (1) Ticketworld has always been easily accessible to the public and, as a result, the policy that § 35-1 advances was accomplished despite the failure to file; (2) no evidence was submitted to the trial court of any harm resulting

---

to attend the events to which they had purchased tickets, and because in the case of Lupovitch, he did not know that the seats were inferior to the description provided to her by his employee. The fact that the defendant would have been willing to refund the customers money if they had opted not to attend the event upon discovering that the tickets they would be provided with were not as good as the ones that they had ordered and paid for does not negate the wilfulness of the defendant's initial conduct in promising to provide a certain product for which it charged the customers a premium and then providing an inferior product. Furthermore, the defendant's lack of knowledge as to the quality of the ticket provided to Lupovitch does not mean that the trial court could not have determined that his conduct with respect to her was wilful, since wilfulness does not require actual knowledge under § 42-110o (b), but only requires that the defendant should have known that his practice was deceptive. Certainly, if the defendant was not certain about the quality of the tickets he was providing to Lupovitch, he should not have professed to know that they were premium seats and charged her a price reflecting premium quality.

to anyone on account of his failure to file the certificate; and (3) the defendant did not knowingly fail to file the certificate but, instead, lacked any knowledge that he was required to do so.

Under § 42-110o (b), the attorney general may recover, on behalf of the state, a civil penalty of not more than $5000 for each wilful violation of § 42-110b prohibiting unfair and deceptive trade practices. Section 42-110o further provides that a wilful violation is a violation that occurs "when the party committing the violation knew or should have known that his conduct was a violation of § 42-110b." Nowhere does this section require the court to consider, in determining whether to assess a penalty, whether the defendant was easily accessible to the public or whether anyone was actually harmed by the unfair or deceptive trade practice. In addition, the section does not require that the defendant have had actual knowledge that the practice was unfair or deceptive. Consequently, it was well within the trial court's discretion to assess the $1000 penalty for the CUTPA violation.

The judgment is reversed with respect to the CUTPA violation that was premised on the conclusion that the defendant, in the operation of his business, violated § 53-289, the judgment is affirmed with respect to the CUTPA violations that pertained to individual instances of deceptive trade practices and with respect to the failure to file a trade name certificate, and the case is remanded with direction to render judgment denying the state's request for injunctive relief.

In this opinion the other justices concurred.