# STATE OF CONNECTICUT *v.* ROBERT HONSCH
## (SC 20742)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Ecker, Dannehy and Moll, Js.

*Syllabus*

Convicted of murder in connection with the disappearance and death of his daughter, E, the defendant appealed to this court. In September, 1995, E's body was discovered in New Britain. E's remains were wrapped in trash bags and sleeping bags, and, although the police were initially unable to identify E, they collected hairs from E's body, as well as a hair and palm prints from the trash bags. At about the same time the police discovered E's body, the defendant told a family member that he was leaving the country imminently to take a job and that E and the defendant's wife, M, had already departed the country. In October, 1995, M's body was found in Massachusetts, and the police were unable to identify her remains at that time. In October or November, 1995, E and M were reported missing, but authorities were unable to locate them. In 2014, law enforcement officers executed a search warrant at the defendant's home in Ohio, where he was using his new wife's last name, and collected samples of his DNA and hair, as well as his finger and palm prints. DNA tests linked the defendant to, among other things, palm prints on the trash bags used to wrap E's remains. The commonwealth of Massachusetts subsequently charged the defendant with, and he was

State *v.* Honsch

convicted of, M's murder. Thereafter, the state of Connecticut charged the defendant with murdering E in Connecticut. Before trial, the defendant moved to dismiss the case for lack of territorial jurisdiction because the state, which conceded that the actual location of E's murder was unknown, had failed to establish that E was murdered in Connecticut. The trial court, however, applied a permissive presumption, consistent with § 1.03 (4) of the Model Penal Code, that the death of a homicide victim occurred in the state where the body was found and, accordingly, denied the motion to dismiss. The trial court also denied the defendant's request for a jury instruction that the presence of his palm prints on the trash bags could not establish his connection with the crime unless it was demonstrated that the prints could have been impressed only at the time that the crime was perpetrated. *Held*:

1. The trial court properly denied the defendant's motion to dismiss for lack of territorial jurisdiction:

The state has territorial jurisdiction to enact criminal laws and to enforce them when the criminal conduct, or the result of the criminal conduct, occurs within its territorial limits, and, to temper the state's burden of proving territorial jurisdiction in murder cases, the common law recognizes a permissive presumption, set forth in § 1.03 (4) of the Model Penal Code, that a murder took place where the victim's body was discovered.

This court embraced that presumption as a rule of criminal procedure and concluded that the trial court properly applied the presumption in light of the robust public policy supporting it and its widespread use around the country.

Specifically, the presumption ensures that the state's interests in enforcing its criminal laws and in pursuing justice for its citizens and the victim's family are vindicated, while also providing the defendant with the opportunity to rebut the presumption with evidence establishing that the murder did not occur within the state.

Contrary to the defendant's contention that the adoption of the presumption set forth in § 1.03 of the Model Penal Code is a question reserved for the legislature and that the legislature did not adopt it when it revised this state's criminal statutes, the presumption survived the enactment of this state's Penal Code because it was a procedural rule, rather than a substantive crime or defense, that existed at common law, and nothing in the Penal Code clearly preempted it.

Moreover, the presumption did not violate the defendant's due process rights by shifting to him the burden of disproving an element of a charged offense, as the location of E's death was not an element of the crime of murder, and the presumption applied to the trial court's preliminary determination of where the murder occurred, which was separate from

349 Conn. 783 OCTOBER, 2024 785

State *v.* Honsch

the subsequent determination of whether the defendant committed the murder.

2. The evidence was sufficient to establish the defendant's identity as the person who murdered E:

The state offered an abundance of consciousness of guilt evidence from which the jury could have reasonably determined that the defendant had murdered E, as the jury could have inferred that certain fabricated statements by the defendant were designed to conceal the fact that he had murdered E, including those in which he deflected responsibility away from himself for the disappearance of E and M and claimed to have selective memory or amnesia preventing him from remembering where he was and what he was doing around the time the bodies were discovered.

Moreover, the jury could have inferred consciousness of guilt because, two months after E's murder, the defendant fled the country for almost four years, when he returned, he assumed the last name of his new wife and began a new life with a new family, and, despite claiming to have loved E, he took no action for twenty years to locate her, which could have led to a reasonable inference that he knew she was not missing because he had murdered her.

Furthermore, there was direct physical evidence that tied the defendant to E's body, insofar as the defendant admitted that he owned the sleeping bags used to wrap E's remains, his palm prints were on the trash bags, and his DNA was concordant with DNA from hairs that were discovered on E's body and one of the trash bags.

3. The trial court properly declined to provide the jury with the defendant's proposed instruction that the presence of his palm prints could not establish his connection with the crime unless it was demonstrated that they could have been impressed only at the time that the crime was perpetrated, as such an instruction was not reasonably supported by the evidence adduced at trial:

This court has held that such a jury instruction is appropriate only when the fingerprint or palm print constitutes the only or the principal evidence of connection to the crime, and, in the present case, evidence of the defendant's palm prints was not the only evidence that connected him to E's body, as there was an abundance of consciousness of guilt evidence, as well as certain other physical evidence.

(*One justice concurring in part and concurring in the judgment*)

Argued March 18—officially released July 19, 2024*

* July 19, 2024, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

State *v.* Honsch

*Procedural History*

Information charging the defendant with the crime of murder, brought to the Superior Court in the judicial district of New Britain, where the court, *Baldini, J.*, denied the defendant's motion to dismiss; thereafter, the case was tried to the jury; verdict and judgment of guilty, from which the defendant appealed to this court. *Affirmed.*

*James B. Streeto*, senior assistant public defender, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom, on the brief, were *Christian M. Watson*, state's attorney, and *Christopher A. Griffin*, former deputy assistant state's attorney, for the appellee (state).

*Opinion*

D'AURIA, J. In this appeal, we must consider the extent of the state's territorial jurisdiction to prosecute a defendant when the defendant disputes whether the crime occurred within Connecticut's geographical boundaries. The defendant, Robert Honsch, appeals from his conviction of murder in violation of General Statutes § 53a-54a (a). On appeal, the defendant claims that (1) the trial court incorrectly denied his pretrial motion to dismiss for lack of territorial jurisdiction because the state had failed to establish that the murder occurred in Connecticut, (2) the evidence was insufficient to establish his identity as the perpetrator of the murder, and (3) the trial court erroneously declined his request to provide the jury with an instruction on fingerprint evidence. We disagree with all three of the defendant's claims and affirm the trial court's judgment.

The jury reasonably could have found the following facts. At approximately 1 a.m. on September 28, 1995, New Britain police officers responded to the rear parking area of a strip mall in New Britain to investigate the report of a dead body. Upon arriving, the police

State *v.* Honsch

officers discovered the remains of a recently deceased young woman, identified two decades later as the defendant's then seventeen year old daughter, Elizabeth Honsch (victim). The victim's body was wrapped in two partially zipped sleeping bags, one pulled over her head, the other pulled over her feet. After removing the sleeping bags, the police officers observed black trash bags covering the victim's head and feet. The victim was fully clothed, warm to the touch, and wearing a watch that displayed the correct time. The police officers observed a gaping head wound above the victim's right temple and air bubbles around her mouth evincing the escape of residual air from her lungs, a condition that remains visible only within several hours after death. Bloodstains on the sleeping bags and the victim's clothes were in various stages of drying, some already coagulated and dry, others still wet.

The police officers did not find any weapons, guns, shell casings, or other physical evidence where the body was found. But they collected several hairs found on the victim's thigh, backside, and wrists, as well as one present on the trash bags, which, along with the sleeping bags, trash bags, and the victim's clothing, they retained for future scientific testing. An autopsy revealed that the victim had died as a result of a contact gunshot wound to the head, meaning that the gun's muzzle was pressed against her head when it was fired and that she died very shortly after that. From the evidence collected at the scene and further investigation into reported missing persons, the police officers were initially unable to identify the victim or the perpetrator.

The defendant had married Marcia Honsch in 1977 in New York, and their daughter, the victim, was born in 1979. The defendant, Marcia, and the victim, along with Marcia's four daughters from a prior marriage (Sheila, Angelina, Debra, and Diana), lived together in the Bronx, New York, until 1984. In 1984, the defendant,

788          OCTOBER, 2024          349 Conn. 783

State *v.* Honsch

Marcia, and the victim moved to Brewster, New York, until 1987, when the defendant and Marcia separated. For the next eight years, the defendant continued to reside in Brewster, while Marcia moved around the country with her daughters. The victim split time living with Marcia and the defendant. In 1995, Marcia and the victim moved back in with the defendant in Brewster to "try to work it out."

In September, 1995, at about the same time that the victim's body was discovered in New Britain, the defendant visited Debra alone at her home in New York, which was not something he had done before. Debra described the defendant's appearance as "unusual" because he was unshaven, "looked really stressed," did not make much eye contact, and his shirt was wrinkled and untucked, which was "totally unlike him." The defendant informed Debra that "his job had offered him an opportunity to work in another country," potentially Australia, England, or in continental Africa, and that, because "he had to make up his mind right away," he did not have time to prepare or tell anyone. He said that, of the options, he had chosen Australia and that he had sent Marcia and the victim "off without . . . saying goodbye to anyone because there was no time . . . ." Just a few months earlier during the summer of 1995, the defendant, Marcia, and the victim made surprise visits to Angelina, Debra, Diana, and Sheila at their homes. There was no indication during any of these visits that the defendant, Marcia, or the victim had planned to move out of the country imminently. To the knowledge of Diana and Debra, Marcia did not have a driver's license or a passport. In October or November of 1995, Diana and Angelina reported to the authorities in Brewster that Marcia and the victim were missing,[1] but the authorities were not able to locate them.

---

[1] Marcia also was killed, and her body was found in the Tolland State Forest in Massachusetts on October 6, 1995. Like the victim in the present

State *v.* Honsch

In 2009, Angelina's Internet searches led her to information that the defendant was living in Ohio and was married to Sheryl Tyree. After years of coordination with Sheryl, Diana finally spoke with the defendant on the phone in November, 2013. The defendant informed Diana that, when he, Marcia, and the victim traveled to Australia, Marcia "found a new man, and she left with the new man . . . and, of course, [the victim] went with her." Diana challenged the defendant, indicating to him that she knew this explanation to be a lie, and the defendant responded, "I don't know if you know, but I have amnesia." The defendant continued his conversation with Diana for approximately thirty minutes, asking about everyone else in the family, including her sisters, and had no trouble remembering their names. After receiving additional information from Diana and Angelina, law enforcement officers from New York determined that a person using the name Robert Tyree, and the defendant's Social Security number, was residing in Ohio, and that he might have information about what had happened to the victim and Marcia.

In 2014, law enforcement officers from New York, Connecticut, and Massachusetts went to the defendant's home in Ohio. The officers informed the defendant that they were investigating two missing persons, and, pursuant to an Ohio search warrant, the police collected samples of his DNA and hair, as well as fingerprints and palm prints. That day, a forensic scientist in Ohio performed a side-by-side comparison between the defendant's fingerprints and palm prints, and the prints

_____

case, Marcia was not identified until 2014. The Commonwealth of Massachusetts charged the defendant with murder in the first degree for Marcia's homicide, a jury found him guilty, he was sentenced to life in prison without the possibility of parole, and the Supreme Judicial Court of Massachusetts recently affirmed his conviction. See *Commonwealth* v. *Honsch*, 493 Mass. 436, 437, 440, 226 N.E.3d 287 (2024). Massachusetts did not bring an indictment in connection with the victim's death in the present case, her body having been found in Connecticut. See id., 440.

State *v.* Honsch

recovered from the trash bags used to wrap the victim. The analysis revealed that the defendant's left palm was the source of one palm print on the trash bag covering the victim's head, and the defendant's right palm was the source of two palm prints on the trash bag covering the victim's feet. Contemporaneously, a forensic scientist in Connecticut performed a DNA analysis of the defendant's hair that showed that two hairs that were discovered on the victim, and one hair that was discovered on one of the trash bags that had been placed on the victim, were "concordant" with the defendant's DNA, meaning that the defendant or another member of the same maternal lineage could not be excluded as being the source of those hairs. Statistically, the defendant's DNA profile would be expected to appear in 3.26 percent of the Caucasian population.

On the same day, the defendant voluntarily spoke with the police both at his home and at an Ohio police station, and provided the police with a handwritten statement.[2] In his interviews and statement, the defendant generally had a clear memory of his life, including his time with Marcia and the victim, but his recollection was "hazy" about events that occurred between July and September, 1995, when Marcia and the victim were murdered. He told the police that he had fond memories of Marcia and the victim, and that he cared for them and loved them. He provided the police with the specific locations where they had lived in New York and other locations that Marcia had traveled to, and he recalled that he and Marcia were separated for a time but that they reunited in 1995. When asked what they enjoyed doing together as a family, the defendant responded that they often went camping together with tents and sleeping bags.

_____
[2] The officers recorded the audio of both interviews and later created transcripts of both interviews, which, along with the defendant's written statement, cumulatively more than 450 pages, were introduced into evidence at trial.

State *v.* Honsch

To the best of the defendant's recollection, the last time he had seen or spoken to Marcia and the victim was at some point between June and September, 1995, most likely in Brewster. He could not remember how they became separated or what happened to them. He said that neither Marcia nor the victim had attempted to contact him in the past twenty years, and he did not attempt to locate, contact, or report them as missing.

He did not independently recall a job transfer to Australia, traveling to Australia himself, sending Marcia and the victim to Australia, or telling Debra that is what happened to Marcia and the victim. Rather, he told the police that, in 1995,[3] for some reason he could not recall, he left his job as a door-to-door vacuum salesman for Electrolux in Brewster to traverse the African continent. He said that, for four years, he "wander[ed] around" thirty countries in Africa working "odd jobs" while struggling to converse with the residents. He "vivid[ly]" recalled his time in Africa eating "pap and mealie-meal," which caused him to lose weight.

Upon his return to the United States in 1999, the defendant began a new life in a new place with a new name and a new family. In 1999, the defendant began working at a truck stop in Illinois, where he met Sheryl Tyree, whom he married in April, 2000. The defendant told the police that he had changed his last name to Tyree because he could no longer stand the last name Honsch. The defendant and Sheryl had three sons, born between 2001 and 2008. The jury reasonably could have believed, from his interview with the police, that the defendant had falsely told his new wife, Sheryl, that he had never been married, had no children or siblings, and that both of his parents were deceased.

---

[3] During his interviews, the defendant was unable to recall the exact date that he arrived in Africa. At trial, the parties stipulated that the defendant arrived in South Africa on November 24, 1995, two months after Marcia and the victim had been murdered.

State *v.* Honsch

The defendant claimed that, after his trip to Africa, he had no memory of Marcia and the victim, and was reminded of their existence only when Debra called asking about their whereabouts twenty years later, a conversation that prompted him to begin piecing together "[c]ertain early memories" of them prior to 1995. For instance, the defendant was able to recall the years, brands, makes, and colors of many cars that he owned prior to 1995 but was unable to remember how or why he lost contact with Marcia and the victim. He told the police that his memory with respect to Marcia and the victim "just stop[s]. That's where everything—we hit this dead end here, where everything just blacks out." When the officers questioned the defendant's selective memory, he responded that, although not officially diagnosed, "it's not actually amnesia, but it's a form," and he said someone in South Africa had told him that his narrow loss of memory was the result of his deteriorating health caused by his minimalist diet while he was in Africa. The defendant was unable to explain why he did not search for Marcia and the victim for twenty years, and he admitted that, if one of his current children went missing for one day, "[o]f course" he would begin searching for them.

The officers also pressed the defendant to explain his connection to the physical evidence found on the victim's body. Regarding his palm prints on the trash bags, the defendant explained that, because the trash bags were his property, it was not surprising that his prints were on them, and he detailed the precise method he used to take out trash in 1995. Specifically, the defendant said that his practice was to remove the trash bags from their box, flap them open, roll them back up again, and leave them on the kitchen counter until he used them to wrap other paper garbage bags containing trash in case of rain. When shown the photographs of the victim's body wrapped in the sleeping bags, the defen-

dant instantly recognized the sleeping bags as "[d]efinitely" belonging to his family. He said he must have slept in them one thousand times and that he kept them in a closet at their house in New York. With respect to the presence of hairs found on the victim's body that had a DNA profile concordant with his DNA profile, he explained that was not unexpected because he spent a great deal of time with her. The defendant said it was possible that someone had come into his house, killed Marcia and the victim, used his trash bags and sleeping bags to wrap the victim, and then left their dead bodies in different states.

After the defendant was charged with and convicted of murdering Marcia in Massachusetts; see footnote 1 of this opinion; the state of Connecticut charged the defendant with murdering the victim in Connecticut. A jury found the defendant guilty, and the court sentenced him to sixty years of imprisonment. The defendant appealed directly to this court pursuant to General Statutes § 51-199 (b) (3).

I

The defendant first claims that the trial court incorrectly denied his pretrial motion to dismiss for lack of territorial jurisdiction because the state had failed to establish that the victim was murdered in Connecticut. The defendant's main contention is that the trial court erred by applying a permissive presumption consistent with Model Penal Code § 1.03 (4), which provides that, if the body of a homicide victim is found within the state, the victim was presumably murdered within the state. See 1 A.L.I., Model Penal Code and Commentaries (1985) § 1.03 (4), p. 34 (Model Penal Code and Commentaries). We disagree that the trial court erroneously denied the defendant's motion to dismiss.

Prior to trial, the defendant moved to dismiss the charge against him for lack of territorial jurisdiction on

State *v.* Honsch

the ground that the state could not establish that the victim was murdered in Connecticut. He argued, and the state later conceded, that the location where the victim was murdered was "unknown." For this reason, the state advocated that the court apply a presumption, not yet applied in Connecticut, but applied by many courts across the country, that the murder occurred in the state where the body was found. The state contended further that this presumption, combined with evidence establishing that the victim's body was deposited in New Britain shortly after she was murdered, was sufficient to establish territorial jurisdiction.

After a two day evidentiary hearing, the court issued a memorandum of decision in which it denied the defendant's motion to dismiss. The court found that, "[a]lthough the evidence conclusively established that [the victim] died of a gunshot wound to her head, the evidence available does not establish precisely where or when she was shot. Specifically, the location where her body was found was devoid of evidence such as blood splatter, a weapon, footprints, drag marks, or shell casings; i.e., evidence that would tend to support a finding that the murder took place where her body was located." Nevertheless, the court found that the victim's body was discovered in Connecticut, which triggered a permissive presumption, applied in many other jurisdictions, that she was murdered within the state. The court held that, in addition to the presumption, there was "compelling and persuasive evidence to indicate that the victim had recently been killed" before she was discovered, including the "condition of her body (intact, warm to the touch, bubbles emanating from her mouth and nose, and blood in various stages of drying)," and that her body was found in New Britain, a city centrally located in Connecticut. The court further held that the state had met its burden despite the defendant's contrary evidence—testimony by the state's chief medical exam-

State *v.* Honsch

iner that rigor mortis was fully developed when he examined the victim's body several hours after she was discovered, and testimony by a detective that it was possible the victim was murdered with Marcia in the Tolland State Forest in Massachusetts.

On appeal, the defendant contests the trial court's application of the presumption to deny his motion to dismiss. He argues that adopting such a presumption is a question strictly reserved for the legislature, that the statute establishing the jurisdiction of our courts, General Statutes § 51-1a (b), does not expressly contain the presumption, and that the presumption violates his due process rights by shifting the burden to him to disprove an element of a charged offense. The state responds that this court need not apply the presumption because the circumstantial evidence introduced at the hearing sufficiently proved beyond a reasonable doubt that the victim was murdered in Connecticut and, alternatively, that this court should apply the presumption as consistent with the common law and not proscribed by our statutes.

Under the common law, a state has "territorial jurisdiction" to enact criminal laws and to enforce them when the criminal conduct takes place, or the result of the criminal conduct occurs, within its territorial limits.[4]

___

[4] The parties and the trial court have characterized the defendant's territorial jurisdiction challenge as involving the trial court's subject matter jurisdiction. Although "the distinction between territorial jurisdiction and subject matter jurisdiction is not always clear"; *In re Teagan K.-O.*, 335 Conn. 745, 765 n.22, 242 A.3d 59 (2020); we view the issue of criminal territorial jurisdiction as separate from the issue of subject matter jurisdiction. See, e.g., A. Spinella, Connecticut Criminal Procedure (1985) p. 19 (advocating that it is "more appropriate" that concept of territorial jurisdiction be treated as separate from "question of subject matter or [personal] jurisdiction"); see also *Romero* v. *Commonwealth*, Docket No. 0050-13-4, 2014 WL 1227696, *10 (Va. App. March 25, 2014) (holding that territorial jurisdiction is different from subject matter jurisdiction). Territorial jurisdiction concerns the geographical boundaries of the *state's authority* to enact and enforce its criminal laws, and to mete out punishment when those laws are violated. See *State* v. *Cardwell*, 246 Conn. 721, 739, 718 A.2d 954 (1998) (territorial jurisdiction "limits the state's interest in vindicating its criminal statutes to within the

State *v.* Honsch

See, e.g., *State* v. *Cardwell*, 246 Conn. 721, 739, 718 A.2d 954 (1998); 4 W. LaFave et al., Criminal Procedure (4th Ed. 2015) § 16.4 (c), pp. 925–26; A. Spinella, Connecticut Criminal Procedure (1985) pp. 18–19. "[I]t is well established that jurisdiction over a criminal offense is determined by the place where the crime was committed. . . . The extent of a sovereignty's jurisdiction to enforce its civil and criminal laws has long been viewed as being coterminous with its territory." (Citation omitted; internal quotation marks omitted.) *State* v. *Lee*, 229 Conn. 60, 77, 640 A.2d 553 (1994). For more than 250 years, we have recognized that the state has territorial jurisdiction to prosecute a defendant if the conduct, or the result of that conduct, occurs, at least in part, inside Connecticut.[5] In contrast, there is no territorial jurisdic-

boundaries of its territory"); 4 W. LaFave et al., Criminal Procedure (4th Ed. 2015) § 16.4 (a), pp. 906–907 (issues presented as a result of "limitations that flow from restrictions on the permissible geographical scope of penal legislation . . . are often roughly analogous to those considered in determining venue" (footnotes omitted)). On the other hand, subject matter jurisdiction concerns the *court's authority* to adjudicate the type of controversy presented in the action before it. See *State* v. *McCleese*, 333 Conn. 378, 386, 215 A.3d 1154 (2019). Subject matter jurisdiction "may not be waived by any party, and also may be raised by a party, or by the court sua sponte, at any stage of the proceedings, including on appeal." (Internal quotation marks omitted.) *State* v. *Delgado*, 323 Conn. 801, 810, 151 A.3d 345 (2016).

The state's alleged failure to prove territorial jurisdiction—i.e., that it has the legal authority to police the criminal conduct at issue—is an issue distinct from the court's authority to adjudicate the case. "The Superior Court hearing a criminal matter acquires subject matter jurisdiction from its authority as a constitutional court of unlimited jurisdiction." (Internal quotation marks omitted.) *State* v. *Carey*, 222 Conn. 299, 305, 610 A.2d 1147 (1992). Our research has not revealed any Connecticut case in which the court's analysis of territorial jurisdiction has involved any of the unique characteristics attributable to subject matter jurisdiction. Specifically, we are not aware of a decision in which a Connecticut court has held that territorial jurisdiction may be raised by any party or by the court at any time, including after the case has ended, or that it may not be waived and, by implication, that the state must prove that territorial jurisdiction exists in every case, even when it is undisputed.

[5] See, e.g., *State* v. *Ross*, 230 Conn. 183, 192, 195, 646 A.2d 1318 (1994) (territorial jurisdiction existed to prosecute defendant for capital felony charges when victims were kidnapped in Connecticut but murdered in Rhode

State *v.* Honsch

tion if *both* the criminal conduct and its results occur outside the state's territory. See *State* v. *Volpe*, 113 Conn. 288, 294, 155 A. 223 (1931) ("[i]t is a general rule of universal acceptation that one [s]tate or sovereignty cannot enforce the penal laws of another, nor punish offenses committed in and against another [s]tate or sovereignty"); see also *State* v. *Cardwell*, supra, 732, 741 (no territorial jurisdiction to prosecute defendant for ticket scalping because he did not sell tickets to Connecticut events in Connecticut).

In Connecticut, whether territorial jurisdiction exists to prosecute a defendant for the crime of murder is an issue for the court to decide. In *State* v. *Beverly*, 224 Conn. 372, 618 A.2d 1335 (1993), the defendant claimed "that the jury, not the trial court, should have made the decision concerning the sufficiency of the facts proven to establish territorial jurisdiction in Connecticut." Id., 378. We rejected this claim, holding that the trial court is required to " 'submit to the jury all controverted questions of fact relating to an element making up [the] crime,' " but "that the location of the site of the victim's death is not an element of the crime of murder." Id., 378–79; see also *State* v. *Weinberg*, 215 Conn. 231, 232, 251–52, 575 A.2d 1003 (location of death is not essential element of murder), cert. denied, 498 U.S. 967, 111 S. Ct. 430, 112 L. Ed. 2d 413 (1990). Consequently, we concluded that, "[a]lthough some authorities have held

Island and their bodies were returned to Connecticut), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995); *State* v. *Beverly*, 224 Conn. 372, 373, 375–78, 618 A.2d 1335 (1993) (territorial jurisdiction existed to prosecute defendant for murder of Massachusetts victim found dead in Connecticut); *State* v. *Pambianchi*, 139 Conn. 543, 546–47, 95 A.2d 695 (1953) (territorial jurisdiction existed to prosecute defendant for stolen automobile received in New York and subsequently taken to Connecticut); *State* v. *Ellis*, 3 Conn. 185, 186 (1819) (territorial jurisdiction existed to prosecute defendant for horse stolen in Rhode Island and taken to Connecticut); *Rex* v. *Peas*, 1 Root 69, 69 (1774) (territorial jurisdiction existed to prosecute defendant for horse stolen in New York and taken to Connecticut).

State *v.* Honsch

otherwise . . . we agree with the decisions holding that the question of where a murder occurred generally is not an element of the offense, but is merely an issue of territorial jurisdiction to be decided by the court. . . . A defendant's constitutional right to a jury does not extend beyond the factual issues that are relevant to the ultimate question of guilt or innocence under the relevant statute.'' (Citations omitted.) *State* v. *Beverly*, supra, 379.[6]

It is well established that the state bears the burden of proving territorial jurisdiction.[7] See *State* v. *Ross*, 230

[6] We acknowledge that "a substantial majority" of states treat the determination of whether territorial jurisdiction exists as, "in part, a jury issue. The court decides as a matter of law whether a particular act or consequence occurring within the boundaries of the state is sufficient to [confer] jurisdiction, and the jury then decides the factual question of whether those acts or consequence which would be sufficient actually occurred in the state." (Footnotes omitted.) 4 W. LaFave et al., supra, § 16.4 (d), pp. 935–36. The defendant, however, does not contend that the jury should have decided territorial jurisdiction, and he does not ask that we overrule *Beverly*.

[7] We once again leave unresolved the question of the quantum of evidence by which the state must prove territorial jurisdiction. In *State* v. *Ross*, supra, 230 Conn. 195, we stated that "the Superior Court has no territorial jurisdiction to adjudicate a charge of murder unless the state proves, beyond a reasonable doubt, that the victim was murdered in Connecticut," but this statement was dictum. The state's burden of proof was not at issue in *Ross*, and the authorities we cited in support of this statement—§ 51-1a (b), *State* v. *Beverly*, supra, 224 Conn. 375–76, and *State* v. *Volpe*, supra, 113 Conn. 294—did not affirmatively resolve that question. Indeed, in *Beverly*, we stated that "[t]he state does not agree with the trial court that the necessary quantum of proof was 'beyond a reasonable doubt.' It contends that its burden was to prove territorial jurisdiction only by a preponderance of the evidence. Because the trial court applied the higher standard in this case, it is not necessary that we reach this issue." *State* v. *Beverly*, supra, 376 n.5.

In the trial court in the present case, the state again took the position that the correct standard of proof should be a preponderance of the evidence, but it does not on appeal renew that argument or otherwise contend that the burden of proof should be less than beyond a reasonable doubt. Nor does the defendant argue that, *with the benefit of the presumption*, the trial court's finding of territorial jurisdiction beyond a reasonable doubt was improper. Rather, the defendant limits his challenge to whether the trial court properly applied a presumption when determining territorial jurisdiction. Therefore, as in *Beverly*, we uphold the trial court's decision applying the higher standard—beyond a reasonable doubt—and have no occasion to decide whether, with the benefit of the presumption, the state should none-

State *v.* Honsch

Conn. 183, 195, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995); *State* v. *Beverly*, supra, 224 Conn. 375. It is not disputed in the present case that the criminal conduct and the result of that conduct occurred in the same location because the victim died very shortly after sustaining a contact gunshot wound to the head. Therefore, to establish territorial jurisdiction to prosecute the defendant for murder, the state had to prove that the victim had been shot within Connecticut's territorial boundaries.

To temper the state's burden of proving territorial jurisdiction in murder cases, the common law recognizes a permissive presumption, or a permissible inference, that the murder took place where the body was discovered. See, e.g., *People* v. *Kamaunu*, 110 Cal. 609, 613, 42 P. 1090 (1895); *Breeding* v. *State*, 220 Md. 193, 200, 151 A.2d 743 (1959); *Commonwealth* v. *Knowlton*, 265 Mass. 382, 388, 163 N.E. 251 (1928); *State* v. *Fabian*, 263 So. 2d 773, 775 (Miss. 1972); *State* v. *McDowney*, 49 N.J. 471, 475, 231 A.2d 359 (1967); *State* v. *Williams*, 321 S.C. 327, 334, 468 S.E.2d 626, cert. denied, 519 U.S. 891, 117 S. Ct. 230, 136 L. Ed. 2d 161 (1996); *Reynolds* v. *State*, 199 Tenn. 349, 350, 287 S.W.2d 15 (1956). This common-law permissive presumption, recognized by courts for many years, eventually was engrafted in Model Penal Code § 1.03 (4), published in 1962, which provides in relevant part that, "if the body of a homicide victim is found within the [s]tate, it is presumed that such result occurred within the [s]tate." Model Penal Code and Commentaries, supra, § 1.03 (4), p. 34. This presumption is permissive because it "permits such a finding upon proof of the location of the body," and, "[i]f the defendant wishes to defeat jurisdiction, he generally must make some showing as to where the death or

theless be able to satisfy its burden by proving territorial jurisdiction under a lower standard.

State *v.* Honsch

injury took place. That showing may, in turn, lay the predicate for a proceeding in the proper jurisdiction.'' Id., § 1.03, comment 8, p. 64; see also 4 W. LaFave et al., supra, § 16.4 (d), pp. 938–39 (describing Model Penal Code § 1.03 (4) as ''establishing a permissible presumption'').

No Connecticut court has yet had occasion to apply this presumption.[8] We embrace the presumption and conclude that the trial court properly applied it here because of the robust public policy supporting it and its widespread use across the country.

To conceal a murder, a criminal defendant may transport the body of the victim from the scene of the murder to a different location, sometimes across state borders. See, e.g., *State* v. *Ross*, supra, 230 Conn. 192, 195 (defendant murdered victims in Rhode Island and returned their bodies to Connecticut); *State* v. *Gojcaj*, 151 Conn. App. 183, 192–93, 92 A.3d 1056 (defendant murdered victim in Connecticut and later left victim's body in New York), cert. denied, 314 Conn. 924, 100 A.3d 854 (2014). Because a murder victim is unable to provide an account of the offense, the defendant's actions to coverup a murder may create inherent and even insurmountable difficulties for the state to prove the location where the murder occurred. The presumption ''endeavors to prevent abortion of the prosecution in cases where the body of the victim is found within the state but it is unclear where the death, injury, or conduct occurred. It may be provable, for example, that the body was thrown from a car driven by the defendant at a place near the state line and that the defendant owned the lethal weapon. That alone might make a

---

[8] The defendant also argues that we ''twice rejected requests for judicial adoption of such a presumption'' in *State* v. *Ross*, supra, 230 Conn. 198, and in *State* v. *Stevens*, 224 Conn. 730, 620 A.2d 789 (1993). The defendant is not correct because, although *Ross* and *Stevens* involved the question of territorial jurisdiction, in neither case were we asked to adopt a presumption similar to that of Model Penal Code § 1.03 (4).

circumstantial case of murder, without establishing a locus for jurisdiction.'' (Footnote omitted.) Model Penal Code and Commentaries, supra, § 1.03, comment 8, pp. 63–64.

In the absence of this presumption, a murderer may succeed in avoiding prosecution simply by moving the body of the victim. This outcome is unjustifiable. We repeatedly have recognized that, when "the fact that the place of death is unknown or that there may be a variance in the proof thereof . . . [n]o person should escape punishment for murder because he is so clever as to conceal . . . the place where the victim was killed or died." (Internal quotation marks omitted.) *State* v. *Weinberg*, supra, 215 Conn. 252; *State* v. *Morrill*, 197 Conn. 507, 552, 498 A.2d 76 (1985). We also recognize the conundrum, applicable in some situations, that, "[i]f . . . the defendant cannot be effectively prosecuted in Connecticut, she cannot be prosecuted at all." *State* v. *Stevens*, 224 Conn. 730, 738, 620 A.2d 789 (1993). The presumption ensures that the state's interests in enforcing its criminal laws and in pursuing justice for its citizens and the victim's family are vindicated, while also providing the defendant with the opportunity to rebut the presumption with evidence establishing that the murder did not occur within the state. See Model Penal Code and Commentaries, supra, § 1.03, comment 8, p. 64.

A majority of the states apply this presumption. The legislative bodies of at least twenty states have codified some form of a presumption or inference in favor of territorial jurisdiction that is congruent with Model Penal Code § 1.03 (4).[9] Seven other states have applied

---

[9] See, e.g., Ariz. Rev. Stat. Ann. § 13-108 (B) (2020) ("[i]f the body of a homicide victim is found in this state it is presumed that the result occurred in this state"); Colo. Rev. Stat. § 18-1-201 (2) (2023) ("if the body of a criminal homicide victim is found within the state, the death is presumed to have occurred within the state"); Del. Code Ann. tit. 11, § 204 (c) (2007) ("if the body of a homicide victim is found within this State it is presumed that the result occurred within the State"); Fla. Stat. Ann. § 910.005 (2) (West 2014)

State *v.* Honsch

("if the body of a homicide victim is found within the state, the death is presumed to have occurred within the state"); Ga. Code Ann. § 17-2-1 (c) (2013) ("if the body of a homicide victim is found within this state, the death is presumed to have occurred within the state"); Haw. Rev. Stat. § 701-106 (4) (2014) ("[i]f the body of a homicide victim is found within the State, it is prima facie evidence that the result occurred within the State"); 720 Ill. Comp. Stat. Ann. 5/1-5 (b) (West 2016) ("if the body of a homicide victim is found within the State, the death is presumed to have occurred within the State"); Ind. Code Ann. § 35-41-1-1 (c) (LexisNexis 2020) ("[i]f the body of a homicide victim is found in Indiana, it is presumed that the result occurred in Indiana"); Iowa Code § 803.1 (2) (2001) ("[i]f the body of a murder victim is found within the state, the death is presumed to have occurred within the state"); Kan. Stat. Ann. § 21-5106 (c) (2023) ("[i]f the body of a homicide victim is found within the state, a person who is charged with committing the homicide is subject to prosecution and punishment under the laws of this state for commission of the homicide"); Ky. Rev. Stat. Ann. § 500.060 (3) (LexisNexis 2014) ("[i]f the body of a homicide victim is found within this state, it shall be prima facie evidence that the result occurred within the state"); Me. Rev. Stat. Ann. tit. 17-A, § 7 (3) (Cum. Supp. 2024) ("[p]roof that the body of a homicide victim is found within this State gives rise to a permissible inference under the Maine Rules of Evidence, rule 303 that such death or impact occurred within the State"); Mo. Rev. Stat. § 541.191.2 (West 2002) ("[i]f the body of a homicide victim is found in this state, it is presumed that the result occurred in this state"); Mont. Code Ann. § 46-2-101 (2) (2023) ("[i]f the body of a homicide victim is found within the state, the death is presumed to have occurred within the state"); N.H. Rev. Stat. Ann. § 625:4 (III) (2016) ("if the body of a homicide victim is found within this state, it is presumed that such result occurred within the state"); N.J. Stat. Ann. § 2C:1-3 (d) (West 2015) ("if the body of a homicide victim is found within the State, it may be inferred that such result occurred within the State"); N.Y. Crim. Proc. Law § 20.20 (2) (a) (McKinney 2018) ("[i]f the offense was one of homicide, it is presumed that the result, namely the death of the victim, occurred within this state if the victim's body or a part thereof was found herein"); Ohio Rev. Code Ann. § 2901.11 (B) (West 2020) ("[i]f any part of the body of a homicide victim is found in this state, the death is presumed to have occurred within this state"); Or. Rev. Stat. § 131.235 (2) (2023) ("[i]f the body, or a part thereof, of a criminal homicide victim is found within this state, it shall be prima facie evidence that the result occurred within this state"); 18 Pa. Cons. Stat. Ann. § 102 (c) (West 2015) ("if the body of a homicide victim, including an unborn child, is found within this Commonwealth, it is presumed that such result occurred within this Commonwealth"); Tex. Penal Code Ann. § 1.04 (b) (West 2021) ("If the body of a criminal homicide victim is found in this state, it is presumed that the death occurred in this state. If death alone is the basis for jurisdiction, it is a defense to the exercise of jurisdiction by this state that the conduct that constitutes the offense is not made criminal in the jurisdiction where the conduct occurred."); Utah Code Ann. § 76-1-201 (3) (a) (LexisNexis 2012) ("[i]f the body of a homicide victim is found within the state, the death shall be presumed to have occurred within the state").

State *v.* Honsch

the presumption as a matter of their common law.[10] To our knowledge, the presumption has not been squarely rejected in any jurisdiction that has considered it.

That twenty state legislatures have codified the presumption statutorily does not persuade us, as the defendant argues, that the adoption of the presumption is a question strictly reserved for the legislature. At the outset, we observe that, contrary to the defendant's argument, the legislature has not yet considered whether to adopt the presumption contained in Model Penal Code § 1.03 (4). In 1963, the legislature established the Commission to Revise the Criminal Statutes (commission) "to revise and codify the criminal statutes of the state," in light of the then recently drafted Model Penal Code and the New York Penal Law, and to "report its findings and specific recommendations for substantive and clarifying changes in said statutes to the [G]eneral [A]ssembly" by February 1, 1965. 31 Spec. Acts 348, No. 351, § 1 (1963); see also 32 Spec. Acts 323–24, No. 315, § 1 (1965) (extending to February 1, 1967, deadline for commission to report findings and recommendations to General Assembly). In its initial report to the General Assembly, the commission, comprised of law professors, state legislators, and attorneys, limited its recommendations to the "substantive criminal statutes, [and] not . . . problems of criminal procedure." Report of the Commission to Revise the Criminal Statutes, as Provided by Special Act No. 351 of the 1963 Session of the General Assembly, p. 1. In its 1967 report, the

---

[10] See, e.g., *People* v. *Kamaunu*, supra, 110 Cal. 613; *Commonwealth* v. *Knowlton*, supra, 265 Mass. 388; *State* v. *Fabian*, supra, 263 So. 2d 775; *State* v. *McDowney*, supra, 49 N.J. 475; *State* v. *Williams*, supra, 321 S.C. 334; *Reynolds* v. *State*, supra, 199 Tenn. 350. Compare *Breeding* v. *State*, supra, 220 Md. 200 ("the finding of a dead body in a particular county raises a presumption, or supports an inference, that the killing took place there"), with *Pennington* v. *State*, 308 Md. 727, 729 n.2, 521 A.2d 1216 (1987) ("[a]t one time, adoption of a similar provision apparently was considered but rejected in Maryland").

commission did not include Model Penal Code § 1.03, or any similar version of that section, in the draft penal code that it submitted to the General Assembly. See Report of the Commission to Revise the Criminal Statutes (1967) pp. 3, 5–37. Although the commission considered Model Penal Code § 1.03 and the parallel provision in the New York Penal Law, it explained that it did not recommend adoption of this section because it was a procedural rule rather than a substantive crime or defense, and, as with New York law, such procedural questions presumably were left to existing law and the courts. See id., p. 43 (recommending against adoption of proposed New York Penal Law provisions limiting applicability of Penal Code because such provisions, "while perhaps helpful, [are] not necessary for our purposes since it is obvious that the procedural rules are not being affected"); see also *Valeriano* v. *Bronson,* 209 Conn. 75, 92, 546 A.2d 1380 (1988) ("adoption of the comprehensive [P]enal [C]ode in 1969 . . . set out *substantive* crimes and defenses" (emphasis added)). Consequently, the legislature's consideration of the commission's report, in connection with the overhaul of our substantive criminal code in 1969, did not include any legislative discussion as to whether to adopt Model Penal Code § 1.03, or any similar version of that section, because the commission did not recommend the adoption of that section. See *State* v. *Ross,* supra, 230 Conn. 197 (although commission "apparently noted and discussed an earlier version of the Model Penal Code incorporating the same expanded view of jurisdiction . . . that discussion did not result in any textual articulation of legislative intent" (citation omitted)). It is inaccurate, therefore, to conclude that the legislature has rejected the presumption contained in Model Penal Code § 1.03 (4). We are not aware of, and the parties have not directed our attention to, any legislative efforts in Connecticut since 1969 to adopt Model Penal Code § 1.03

State *v.* Honsch

(4) or any similar presumption in favor of criminal territorial jurisdiction.

Notwithstanding that many states have codified this presumption by enacting a form of § 1.03 (4) of the Model Penal Code; see footnote 9 of this opinion; although the legislature has not taken up the question, legislation is not the exclusive way for a jurisdiction to recognize the presumption. As we have stated, the permissive presumption that a murder occurred where a body is found was a recognized common-law principle that existed prior to the promulgation of the Model Penal Code in 1962 and its subsequent adoption in many states. See, e.g., *People* v. *Kamaunu*, supra, 110 Cal. 613; *Breeding* v. *State*, supra, 220 Md. 200; *Commonwealth* v. *Knowlton*, supra, 265 Mass. 388; *Reynolds* v. *State*, supra, 199 Tenn. 350; see also Conn. Code Evid. § 3-1 (presumptions are governed by principles of common law except as otherwise required by federal and Connecticut constitutions or any rule of practice adopted before June 18, 2014).

Additionally, it is true that the state constitution assigns to the legislature the power to enact laws defining crimes and fixing the degree and method of punishment; see, e.g., *State* v. *Courchesne*, 296 Conn. 622, 711, 998 A.2d 1 (2010); and "the comprehensive Penal Code in 1969 abrogated the common-law authority of Connecticut courts to impose criminal liability for conduct not proscribed by the legislature." (Internal quotation marks omitted.) *State* v. *Leniart*, 333 Conn. 88, 109, 215 A.3d 1104 (2019). The issue of territorial jurisdiction, however, is a rule of procedure unrelated to the substantive elements of the crime. See *State* v. *Beverly*, supra, 224 Conn. 378–79; Report of the Commission to Revise the Criminal Statutes (1967) pp. 42–43.

Even if the issue of territorial jurisdiction were considered a principle of substantive criminal liability, as

State *v.* Honsch

opposed to an issue of criminal procedure, "the savings clause to the Penal Code, [General Statutes § 53a-4] provides, and our cases recognize, that the common law is preserved under the code unless clearly preempted; the code does not bar our courts from recognizing other principles of criminal liability or other defenses not inconsistent with statute." (Internal quotation marks omitted.) *State* v. *Leniart*, supra, 333 Conn. 109; see also *Ullmann* v. *State*, 230 Conn. 698, 705, 647 A.2d 324 (1994) ("[a]bsent clear intent to do so, a statute should not be construed as altering the common law rule . . . and should not be construed as making any innovation upon the common law which the statute does not fairly express" (internal quotation marks omitted)). Thus, the presumption survived the enactment of the Penal Code because it existed at common law and nothing in the Penal Code clearly preempted it. This is true even though not until the present case has a Connecticut court recognized the presumption we recognize today as part of our common law. See, e.g., *State* v. *Courchesne*, supra, 296 Conn. 674–82 and nn.36 and 39 (rejecting contention that "doctrine or principle does not represent the common law of this state until it has been expressly recognized and applied by one or more courts of the state," and adopting common-law born alive rule recognized in other states because "reasons for recognizing the rule are compelling and because there is no persuasive reason for not doing so"); *Carl J. Herzog Foundation, Inc.* v. *University of Bridgeport*, 243 Conn. 1, 5–6, 699 A.2d 995 (1997) (considering whether legislature abrogated common-law rule as recognized by other jurisdictions); see also *In re Zakai F.*, 336 Conn. 272, 288, 255 A.3d 767 (2020) (surveying common law of Connecticut and other states in adopting presumption that was not clearly provided for in statutory language).

In the past, when faced with an absence of legislation governing an issue presented to us, we have found it

State *v.* Honsch

prudent to adopt other procedural provisions of the Model Penal Code. See, e.g., *State* v. *Crawford*, 202 Conn. 443, 450–51, 521 A.2d 1034 (1987) (adopting Model Penal Code § 1.06 (5) concerning tolling of statute of limitations). We also have gone further, as expressly permitted by the statutory savings clause, and recognized principles of criminal liability and defenses in the absence of applicable language in our Penal Code. See, e.g., *State* v. *Terwilliger*, 314 Conn. 618, 654, 104 A.3d 638 (2014) (self-defense); *State* v. *Courchesne*, supra, 296 Conn. 622, 679–88 and n.44 (born alive principle); *State* v. *Walton*, 227 Conn. 32, 45, 630 A.2d 990 (1993) (vicarious liability of conspirator). We are once again compelled to recognize in our law a rule of criminal procedure that ensures that justice is done.

Nor are we persuaded that the absence of the presumption in the language of § 51-1a should impact our analysis. That statute, entitled "Composition of Judicial Department," provides in relevant part: "(b) [t]he territorial jurisdiction of the Supreme Court, the Appellate Court, and the Superior Court shall be coextensive with the boundaries of the state . . . ." General Statutes § 51-1a (b). The defendant asserts that, because this statute, concerning the jurisdiction of the courts, is silent as to whether a permissive presumption exists in a murder case when the body is found in this state, the legislature necessarily rejected this common-law rule. Although the phrase "territorial jurisdiction" is present in the language, the statute plainly defines the geographical reach of the courts of this state to resolve all types of disputes (civil, criminal, and otherwise), not the boundaries of the state's power to enact and vindicate its criminal laws. See footnote 4 of this opinion. Even if we assume, without deciding, that § 51-1a could be read to restrict the state's criminal territorial jurisdiction, we cannot construe it in the present case to prohibit the common law's permissive presumption

State *v.* Honsch

that the murder occurred where the body is found because there is no clear indication that the legislature intended to foreclose the presumption. See *State* v. *Courchesne*, supra, 296 Conn. 711. Thus, the fact that our statutes are silent on the recognition of the presumption cuts *against* the defendant's assertion.

Finally, we reject the defendant's contention that the presumption violates his due process rights by shifting the burden to him to disprove an element of a charged offense. As we have recognized, the location of the victim's death is not an element of the crime of murder; see *State* v. *Beverly*, supra, 224 Conn. 378–79; *State* v. *Weinberg*, supra, 215 Conn. 232, 251; and, therefore, the presumption in no way relieves the state of the burden to prove any essential element to the satisfaction of the trier of fact. Compare *State* v. *Francis*, 246 Conn. 339, 354, 717 A.2d 696 (1998) ('''[m]andatory presumptions . . . violate the [d]ue [p]rocess [c]lause if they relieve the [s]tate of the burden of persuasion on an element of an offense' ''), with *State* v. *Palmer*, 206 Conn. 40, 47–48, 536 A.2d 936 (1988) (describing permissive presumption as suggesting or allowing—but not requiring— possible conclusion to be drawn if state proves predicate facts), and *State* v. *Diaz*, 237 Conn. 518, 545–46, 679 A.2d 902 (1996) (same). The presumption applies to the court's preliminary determination of *where* the murder occurred, an issue entirely separate from the subsequent determination of whether the defendant committed the murder. The permissive presumption, which places no burden of proof on the defendant, allows but does not require the court to find territorial jurisdiction if the state proves that the victim's body was located in Connecticut. The defendant has not provided us with a case from any of the almost thirty states that have applied the presumption, holding that it is unconstitutional, even in the jurisdictions that submit the question of territorial jurisdiction to the jury as an

State *v.* Honsch

element of the offense. See, e.g., *State* v. *Trusty*, 326 S.W.3d 582, 599–601 (Tenn. Crim. App. 2010) (rejecting claim that jury instruction permitting inference in favor of territorial jurisdiction violated defendant's due process rights), appeal denied, Tennessee Supreme Court, Docket No. M2008-02653-SC-R11-CD (September 27, 2010); see also *State* v. *Liggins*, 524 N.W. 2d 181, 185 (Iowa 1994) (same).

We recognize that the permissive presumption may impose a burden of production on defendants to present rebutting evidence to establish that the murder did not occur in Connecticut, but we are not persuaded that any difficulty they might encounter in meeting this burden is sufficient to overcome the important policy reasons supporting the permissive presumption. Criminal defendants face countervailing presumptions in all types of cases. See, e.g., General Statutes § 53a-32 (e) (rebuttable presumption that "serious firearm offender poses a danger to the safety of other persons"); General Statutes § 53a-119 (15) (rebuttable presumption that "person to whom the service is billed has the intent to obtain the service and to avoid making payment for the service" in certain circumstances); General Statutes § 53a-127c (a) (rebuttable presumption that "person is engaged in the business for profit or economic gain of offering for sale a decoder, descrambler or other device, equipment or component" in certain circumstances); General Statutes § 53a-128 (b) (issuer of check is "presumed to know that the check or order, other than a postdated check or order" would not be paid in certain circumstances); General Statutes § 53a-282 (imposing four separate presumptions in money laundering cases). Moreover, it is feasible for a defendant to submit evidence to rebut the presumption in favor of territorial jurisdiction. As the defendant sought to do in the present case, an accused may attempt to present noninculpatory evidence that the murder occurred in a different state,

State *v.* Honsch

such as the extent of the victim's rigor mortis in conjunction with the time it would take to travel from a different state, or that the victim was murdered with a close family member outside of this state's borders.[11] Even if the burden of production would require the defendant to consider proffering less than exculpatory evidence—an undertaking the defendant might choose strategically to avoid—the defendant has advanced no authority for the proposition that such a burden of production violates due process.

In sum, we disagree with the defendant that the trial court improperly applied the presumption in favor of territorial jurisdiction. We agree with the trial court that the presumption, coupled with evidence establishing that the victim's body was recently deposited in New Britain, was sufficient to establish territorial jurisdiction.

II

The defendant next claims that the evidence was insufficient to establish his identity as the person who murdered the victim. He concedes that the evidence was sufficient to establish that the victim was killed intentionally, but he argues that the state's circumstantial evidence—"consciousness of guilt and fingerprint evidence on the garbage bags, a common household

---

[11] The presumption in favor of territorial jurisdiction is not conclusive because there is a possibility that the defendant can overcome it. Although it may prove difficult for a defendant to muster evidence to defeat territorial jurisdiction and to seek prosecution in another state, it is not as impossible as it may seem. See, e.g., *People* v. *Holt*, 91 Ill. 2d 480, 492, 440 N.E.2d 102 (1982) (reversing murder conviction for lack of territorial jurisdiction because defendant's own statements, which were "only evidence of exactly what happened," showed that events occurred in another state). With advances in technology and science, it is not difficult to imagine fact patterns—even if rare—involving forensics (where the victim's death cannot be explained as occurring in Connecticut) or a video recording of a homicide (where the perpetrator cannot be identified) that would rebut any permissive presumption that the victim was killed in Connecticut, proving that any presumption is not at all conclusive.

State *v.* Honsch

item''—was insufficient to prove that the defendant had committed the murder.[12] We are not persuaded.

"[T]he question of identity of a perpetrator of a crime is a question of fact that is within the sole province of the jury to resolve. . . . To determine whether the evidence was sufficient to establish the essential element of identity, we apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom, the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt . . . . In doing so, we are mindful that the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier [of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *State* v. *Patrick M.*, 344 Conn. 565, 574–75, 280 A.3d 461 (2022).

"[W]e must focus on the evidence presented, not the evidence that the state failed to present . . . . [W]e do not draw a distinction between direct and circumstantial evidence so far as probative force is concerned . . . . Indeed, [c]ircumstantial evidence . . . may be more certain, satisfying and persuasive than direct evidence. . . . It is not one fact . . . but the cumulative impact of a multitude of facts [that] establishes guilt in a case involving substantial circumstantial evidence." (Citations omitted; internal quotation marks omitted.)

[12] We also reject the defendant's argument that the state failed to present evidence of his motive to murder the victim. The state is not required to prove motive, as "[i]t is axiomatic that motive is not an element of the crime of murder . . . ." (Citation omitted.) *State* v. *Ortiz*, 343 Conn. 566, 603, 275 A.3d 578 (2022); see also *State* v. *Pinnock*, 220 Conn. 765, 793, 601 A.2d 521 (1992).

*State* v. *Abraham*, 343 Conn. 470, 477, 274 A.3d 849 (2022).

We conclude that the evidence the state offered was more than sufficient to establish the defendant's identity as the person who murdered the victim. Primarily, the state presented an abundance of consciousness of guilt evidence, consisting of the defendant's own statements and his actions following the murder, from which the jury could have reasonably concluded that the defendant murdered the victim. "[T]he state of mind that is characterized as 'guilty consciousness' or 'consciousness of guilt' is strong evidence that a defendant is indeed guilty." *State* v. *Moody*, 214 Conn. 616, 626, 573 A.2d 716 (1990); see also *State* v. *Rodriguez*, 337 Conn. 175, 201, 252 A.3d 811 (2020) ("'a jury may infer guilt based on consciousness of guilt evidence in conjunction with other evidence' "); *State* v. *McClain*, 324 Conn. 802, 819, 155 A.3d 209 (2017) (consciousness of guilt is "indirect evidence of the defendant's guilt").

Jurors reasonably could have concluded that several of the defendant's statements constituted inconsistent or partial truths manifesting his participation in the crime or evidencing his consciousness of guilt. See *State* v. *Moody*, supra, 214 Conn. 626 (consciousness of guilt evidence may include " 'misstatements of an accused, which a jury could reasonably conclude were made in an attempt to avoid detection of a crime or responsibility for a crime or were influenced by the commission of the criminal act' "). For example, the state presented evidence of the defendant's statements to Marcia's and his own family members that the jury could have found to be lies told to deflect responsibility away from himself for the disappearance of Marcia and the victim. Specifically, he told Debra in 1995 that he took a new job in Australia and sent the victim there ahead of him; he told Diana in 2013 that Marcia ran off with a new man in Australia and that the victim followed her; and

he told Sheryl that he had never been married, had no children or siblings and that both of his parents were deceased. Further, the state presented evidence that the defendant had told the police that, unlike other parts of his life that he could recall, he had no recollection of the fall of 1995 when the victim was murdered and that his selective memory was, as he was told, a result of his malnourishment caused amnesia that he had sustained in Africa. The jury could have reasonably disbelieved this fanciful explanation to the police for his inability to explain where he was and what he was doing at about the time the police discovered the bodies of his wife in Massachusetts and his daughter, the victim in the present case, in New Britain. See, e.g., *State* v. *Diaz*, 348 Conn. 750, 767, 311 A.3d 714 (2024) (lying to police can indicate consciousness of guilt). The jury could have inferred that these fabricated statements were designed to conceal the fact that the defendant had murdered the victim.

The jury also could have inferred the defendant's consciousness of guilt because he had fled to Africa two months after the victim was murdered and her body was discovered. See, e.g., *State* v. *Patrick M.*, supra, 344 Conn. 577 (" '[F]light, when unexplained, tends to prove a consciousness of guilt. . . . The flight of the person accused of a crime is a circumstance [that], when considered together with all the facts of the case, may justify an inference of the accused's guilt.' "). The defendant offered no reason why, just after their disappearance and the discovery of their bodies, he suddenly left his wife and child (Marcia and the victim), whom he claimed to care for very deeply, as well as his home and job, to "[wander] around" Africa for almost four years. In the absence of an explanation, it was permissible for the jury to infer that the defendant's flight showed a consciousness of guilt caused by his murder of the victim. Although the defendant

State *v.* Honsch

contends that the evidence of flight was insignificant because he waited two months to fly to Africa, it was the responsibility of the jury to weigh the significance of that evidence. See, e.g., *State* v. *Kelly*, 256 Conn. 23, 57, 770 A.2d 908 (2001) ("it is the province of the jury to sort through any ambiguity in the evidence in order to determine whether the defendant's flight warrants the inference that he possessed a guilty conscience").

When he returned from Africa, the defendant shed his last name and took the last name of his new wife, Sheryl, which also could constitute evidence of consciousness of guilt. See, e.g., *State* v. *Sivri*, 231 Conn. 115, 130, 646 A.2d 169 (1994) (consciousness of guilt can be proven by "use of aliases upon [defendant's] return to the United States"); *State* v. *Avis*, 209 Conn. 290, 310, 551 A.2d 26 (1988) (evidence that defendant used "number of aliases . . . supported the inference that he was conscious of his guilt"), cert. denied, 489 U.S. 1097, 109 S. Ct. 1570, 103 L. Ed. 2d 937 (1989). Although the defendant claimed that he changed his last name because he did not like the name Honsch, the jury reasonably could have inferred that he did so to avoid detection by the authorities investigating the victim's murder. He began a new life with a new family, never actively searching for the whereabouts of the victim, his own daughter. These actions and inaction reasonably could have led the jury to infer a consciousness of guilt. The defendant claimed to have loved the victim, but he never noticed her disappearance from his life and took no action for twenty years to locate her or to determine what had happened to her. In contrast, the defendant admitted that, if one of his current children went missing for one day, "[o]f course" he would begin searching for them. The defendant's failure to take any action to locate his daughter could have led to a reasonable inference that he knew the victim

State *v.* Honsch

was not, in fact, missing for twenty years because he had murdered her in 1995.

The state also presented direct physical forensic evidence that tied the defendant to the victim's dead body. The state presented unrefuted evidence that the defendant's left palm was the source of one palm print on the trash bag covering the victim's head, and the defendant's right palm was the source of two palm prints on the trash bag covering the victim's feet. It was reasonable for the jury to conclude that the defendant had imprinted his palm prints on the trash bags while disposing of the victim's body after murdering her. See *State* v. *Rhodes*, 335 Conn. 226, 240, 249 A.3d 683 (2020) (jury is entitled to use common sense, experience, and knowledge of human nature). The state also established that two hairs that were discovered on the victim's body and one hair that was discovered on one of the trash bags that had been placed on the victim's body were "concordant" with the defendant's DNA. Furthermore, the defendant repeatedly admitted that he owned the two sleeping bags used to wrap the victim's dead body. This direct physical evidence, combined with the indirect consciousness of guilt evidence, was sufficient to establish the defendant's identity as the person who murdered the victim. See, e.g., *State* v. *Rodriguez*, supra, 337 Conn. 201–202 (state sufficiently proved identity with circumstantial and direct DNA evidence).

The defendant nevertheless contends that the existence of his palm prints on the garbage bags is explicable because he owned them, and that fact alone was not sufficient to convict him of murder. In contrast to the defendant's contention, the jury was free to reject as farfetched his explanation that his palm prints were present on the bags because he removed, opened, and then rerolled all of the trash bags in his home prior to use. See, e.g., *State* v. *Gray*, 221 Conn. 713, 721, 607 A.2d 391 (jury is entitled to reject defendant's theories),

State *v.* Honsch

cert. denied, 506 U.S. 872, 113 S. Ct. 207, 121 L. Ed. 2d 148 (1992).

In short, construing the evidence as favorably as possible to sustaining the guilty verdict, we conclude that the state's case was sufficient for the jury to find beyond a reasonable doubt that the defendant had murdered the victim.

III

The defendant finally claims that the trial court erred by declining to provide the jury with defense counsel's requested instruction on fingerprint evidence. We do not agree.

Prior to the final charge conference, defense counsel requested, in accordance with *State* v. *Santangelo*, 205 Conn. 578, 598, 534 A.2d 1175 (1987), that the court provide the jury with a fingerprint evidence instruction, stating that, "[u]nless it can be shown that the circumstances are such that the fingerprints could have been impressed only at the time the crime was perpetrated, the presence of the defendant's fingerprints does not establish his connection with the crime charged." At the charge conference, defense counsel acknowledged that *Santangelo* contained the "caveat" that this instruction is appropriate only when the fingerprint evidence is the primary or principal evidence of the defendant's connection to the crime. Defense counsel argued that the instruction was appropriate because, although some hairs on the victim's body were concordant with the defendant's DNA, the palm print evidence was "really the only evidence establishing [the defendant's] connection to the [victim's] body . . . ." The state responded that the instruction was inappropriate pursuant to *Santangelo* because the palm print evidence was not "the only evidence, or the principal evidence," that the jury could use to find the defendant guilty since the state had presented evidence that he had a guilty conscience,

State *v.* Honsch

his DNA profile was concordant with hairs found on the victim's body, and she was wrapped in his sleeping bags. The court, relying on *Santangelo*, denied defense counsel's request to instruct the jury for the same reasons that the state articulated.

"In determining whether the trial court improperly refused a request to charge, [w]e . . . review the evidence presented at trial in the light most favorable to supporting the . . . proposed charge. . . . A request to charge [that] is relevant to the issues of [a] case and [that] is an accurate statement of the law must be given. . . . If, however, the evidence would not reasonably support a finding of the particular issue, the trial court has a duty not to submit it to the jury. . . . Thus, a trial court should instruct the jury in accordance with a party's request to charge [only] if the proposed instructions are reasonably supported by the evidence." (Internal quotation marks omitted.) *State* v. *Ashby*, 336 Conn. 452, 497–98, 247 A.3d 521 (2020). Whether the evidence supported defense counsel's requested charge is a question of law over which our review is plenary. See, e.g., *Brown* v. *Robishaw*, 282 Conn. 628, 633–34, 922 A.2d 1086 (2007).

We have repeatedly held "that a conviction may not stand on fingerprint evidence alone unless the prints were found under such circumstances that they could only have been impressed at the time the crime was perpetrated." (Internal quotation marks omitted.) *State* v. *Santangelo*, supra, 205 Conn. 598; see also *State* v. *Edwards*, 325 Conn. 97, 139, 156 A.3d 506 (2017); *State* v. *Payne*, 186 Conn. 179, 184, 440 A.2d 280 (1982); *State* v. *Mayell*, 163 Conn. 419, 426, 311 A.2d 60 (1972). In *Santangelo*, we held that an instruction in accordance with this principle "is germane where the fingerprints of an accused constitute *the only evidence, or the principal evidence to convict*." (Emphasis added.) *State* v. *Santangelo*, supra, 599; see also *State* v. *Lytell*, 206

State *v.* Honsch

Conn. 657, 663, 539 A.2d 133 (1988) (upholding trial court's refusal to provide jury with *Santangelo* instruction because, in addition to fingerprint evidence, jury also had evidence that witness had positively identified defendant as perpetrator of robbery, and defendant knew that victims "kept a large sum of money in the cafe to cash payroll checks").

We agree with the trial court that the defendant's requested *Santangelo* instruction was not warranted because the palm print evidence was not the only or principal evidence against him. As we explained in part II of this opinion, there was an abundance of consciousness of guilt evidence, including the defendant's false statements to Marcia's family members and the police, his unexplained flight to Africa after the murders, his adoption of a new life and identity when he returned to the United States, and his failure for twenty years to search for the whereabouts of his purportedly missing child. There also was physical evidence that the defendant's DNA was concordant with the hairs found on the victim's body, and he admitted that she was wrapped in sleeping bags that belonged to him. Consequently, "the trial court was under no obligation to give the requested fingerprint instruction because of the significant other evidence in [the] case." *State* v. *Lytell*, supra, 206 Conn. 663. Therefore, we conclude that the court properly declined to give the jury a *Santangelo* instruction because the evidence did not reasonably support that instruction.

The judgment is affirmed.

In this opinion ROBINSON, C. J., and MULLINS, ECKER, DANNEHY and MOLL, Js., concurred.

McDONALD, J., concurring in part and concurring in the judgment. I agree with, and join, parts II and III of the majority opinion. Specifically, I agree with the

majority that the evidence was sufficient to establish the identity of the defendant, Robert Honsch, as the person who murdered the victim and that the trial court properly declined to provide the jury with an instruction regarding fingerprint evidence. I also agree with the result, but not the reasoning, of part I of the majority opinion. As to part I, I agree that this court should adopt a "permissive presumption" that provides that, when the location of a killing is unknown, and the victim's body is found in the forum state, it may be inferred or presumed that the death occurred in the state for purposes of establishing territorial jurisdiction. See, e.g., 1 A.L.I., Model Penal Code and Commentaries (1985) § 1.03 (4), p. 34 (Model Penal Code and Commentaries); 4 W. LaFave et al., Criminal Procedure (4th Ed. 2015) § 16.4 (c), p. 931; see also, e.g., *State* v. *McDowney*, 49 N.J. 471, 475, 231 A.2d 359 (1967) ("circumstantial evidence [such] as the presence of the body within the [s]tate has been held sufficient to allow the drawing of an inference that the crime was committed at that place"). I write separately with respect to part I of the majority opinion to emphasize that this "permissive" or "rebuttable" presumption is effectively a conclusive presumption.

As the majority opinion aptly lays out, there is significant support for our adoption of a presumption that permits an inference that a homicide occurred in the state where the victim's body was found for purposes of establishing jurisdiction when there is no other evidence concerning the location of the homicide. See part I of the majority opinion. At least twenty states have codified the presumption in legislation; see footnote 9 of the majority opinion and accompanying text; and seven other states apply the presumption as a matter of common law. See footnote 10 of the majority opinion and accompanying text. More important, there is a strong public policy rationale that weighs heavily in

State *v.* Honsch

favor of adoption. See part I of the majority opinion. The presumption "endeavors to prevent abortion of the prosecution in cases [in which] the body of the victim is found within the state but it is unclear where the death, injury, or conduct occurred. It may be provable, for example, that the body was thrown from a car driven by the defendant at a place near the state line and that the defendant owned the lethal weapon. That alone might make a circumstantial case of murder, without establishing a locus for jurisdiction." (Footnote omitted.) Model Penal Code and Commentaries, supra, § 1.03, comment 8, pp. 63–64. As we have explained, when "the place of [the victim's] death is unknown or [when] there [is] a variance in the proof thereof . . . [n]o person should escape punishment for murder because he is so clever as to conceal . . . the place where the victim was killed or died." (Internal quotation marks omitted.) *State* v. *Weinberg*, 215 Conn. 231, 252, 575 A.2d 1003, cert. denied, 498 U.S. 967, 111 S. Ct. 430, 112 L. Ed. 2d 413 (1990). In short, a presumption ensures that a homicide will not go unprosecuted simply because the culprit was able to conceal the location of the crime.

Nevertheless, I think it is important to recognize the presumption for what it is—an effectively conclusive presumption. See, e.g., *Francis* v. *Franklin*, 471 U.S. 307, 314 n.2, 105 S. Ct. 1965, 85 L. Ed. 2d 344 (1985) ("A mandatory presumption may be either conclusive or rebuttable. A conclusive presumption removes the presumed element from the case once the [s]tate has proved the predicate facts giving rise to the presumption. A rebuttable presumption does not remove the presumed element from the case but [instead] requires the jury to find the presumed element unless the defendant persuades the jury that such a finding is unwarranted."). Although courts often refer to this presumption as either "rebuttable" or "permissive," the reality is that

State *v.* Honsch

a criminal defendant has no meaningful ability to rebut the presumption without incriminating himself in the crime. Indeed, the majority explains that, "[i]f the defendant wishes to defeat jurisdiction, he generally must make some showing as to where the death or injury took place. That showing may, in turn, lay the predicate for a proceeding in the proper jurisdiction." (Internal quotation marks omitted.) Part I of the majority opinion, quoting Model Penal Code and Commentaries, supra, § 1.03, comment 8, p. 64. But, in most situations, the ability to make that showing will run headlong into the defendant's fifth amendment privilege against self-incrimination. Cf. *State* v. *Wogenstahl*, 150 Ohio St. 3d 571, 582, 84 N.E.3d 1008 (2017) (French, J., concurring) (questioning constitutionality of Ohio statute that requires conclusive presumption that crime was committed in Ohio if it "cannot reasonably be determined in which [state] it took place" (internal quotation marks omitted)), cert. denied, 584 U.S. 1004, 138 S. Ct. 2576, 201 L. Ed. 2d 298 (2018). How is a criminal defendant to make a showing that the homicide occurred in another state without implicating himself in the crime?[1] However, given the strong public policy rationale for the adoption of the presumption, and the significant legal support for its adoption, I agree with the majority that it is appropriate for this court to adopt the presumption.

For the foregoing reasons, I respectfully concur in part.

_____

[1] I recognize, as the majority posits, that there may be circumstances in which it would be "feasible" for a defendant to present noninculpatory evidence as to the location of the crime. Footnote 11 of the majority opinion and accompanying text. In practice, however, it would be highly unlikely that a defendant could muster such evidence in a manner sufficient to rebut the presumption without incriminating himself.